RICHARD K. HANSEN, No. 832231
  *rhansen@schwabe.com*
NATHAN D. SRAMEK, No. 140173
  *nsramek@schwabe.com*
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW Fifth Avenue, Suite 1900
Portland, Oregon 97204
+1 503 222 9981
+1 503 796 2900 (fax)

DONALD F. ZIMMER, JR., (*Pro Hac Vice pending*)
  *fzimmer@kslaw.com*
CHERYL A. SABNIS, (*Pro Hac Vice pending*)
  csabnis@kslaw.com
ALEXANDRA KENNEDY-BREIT, (*Pro Hac Vice pending*)
*akennedy-breit@kslaw.com*
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, California 94105
+1 415 318 1200
+1 415 318 1300 (fax)

Attorneys for Defendants
MONSANTO COMPANY; SOLUTIA
INC.; AND PHARMACIA LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON by and through Ellen F. Rosenblum, Attorney General for the STATE OF OREGON,<br><br>       Plaintiff,<br><br>   v.<br><br>MONSANTO COMPANY; SOLUTIA INC.; PHARMACIA LLC, et al.,<br><br>       Defendants. | Case No. 3:18-cv-00238<br><br>**NOTICE OF REMOVAL AND REMOVAL OF ENTIRE CASE TO FEDERAL COURT PURSUANT TO 28 U.S.C. §§ 1331, 1441, 1442**<br><br>Circuit Court of the State of Oregon County of Multnomah<br>Case No. 18CV00540 |

//

TO THE CLERK OF THE COURT:

PLEASE TAKE NOTICE that defendants Monsanto Company ("Monsanto"), Solutia Inc.

("Solutia") and Pharmacia LLC ("Pharmacia") (together, "Defendants"), pursuant to 28 U.S.C.

§§ 1331, 1441 and 1442, remove this case from the Circuit Court of the State of Oregon,

Multnomah County, to the United States District Court for the District of Oregon, Portland

Division. This Court has jurisdiction under 28 U.S.C. § 1442(a)(1) because this is a civil action

brought against a person acting under color of an office or agency of the United States, as well as

under 28 U.S.C. § 1331 and U.S. Const. art. I, sec. 8, cl. 17 as Plaintiff's claims arise, in part, on

"federal enclaves" and under federal laws.

## I.    PROCEDURAL BACKGROUND

1.    On January 4, 2018, Plaintiff the State of Oregon filed in the Circuit Court of the

State of Oregon, County of Multnomah, a complaint titled *State of Oregon by and through Ellen*

*F. Rosenblum, Attorney General for the State of Oregon v. Monsanto Company, Solutia Inc.,*

*Pharmacia LLC et al.*, Case No. 18CV00540 ("Complaint"). A copy of the Complaint is attached

as **Exhibit 1** ("Compl."). The only defendants sued by their names are Defendants.[1] *See* Compl

at p.1.

2.    This is a civil action in which Plaintiff alleges five separate causes of action—

public nuisance, purpresture, trespass, equitable indemnity and unjust enrichment. *See* Compl. ¶¶

107–143. It requests relief by way of orders to abate the alleged public nuisance and remove and

remediate the alleged contamination, restitution, damages (in an amount not less than $100

---

[1] Plaintiff also sued fictitiously named defendants Does 1 through 10. Because they have not "been properly joined and served" (and may not exist at all), their consent to removal is not required under 28 U.S.C. § 1446(b)(2). *See Destfino v. Reiswig*, 630 F.3d 952, 957 (9th Cir. 2011).

million), pre- and post-judgement interest, attorneys' fees and litigation costs (Compl. Prayer for Relief).

3.      Defendants have 30 days to remove following service of a copy of the complaint on its agent for service of process—served here on January 4, 2018 (**Exhibit 2**). Therefore, this notice of removal, filed on February 5, 2018, is timely.

4.      The Complaint was originally filed in the Circuit Court of the State of Oregon, County of Multnomah. Therefore, venue is proper in the United States District Court for the District of Oregon pursuant to 28 U.S.C. §§ 1441(a), 1442(a) and 1446(a), as it embraces the place in which the removed action is pending.

5.      Because the Complaint was filed in the County of Multnomah, the case should be assigned to a District Judge in the Portland Division pursuant to LR 3-2(a)(1). The Honorable Michael W. Mosman is currently presiding over related litigation entitled *Port of Portland v. Monsanto Company, et al*, Case No. 3:17-cv-00015-MO and *City of Portland v. Monsanto Company, et al*, Case No. 3:16-cv-01418-MO.

6.      The only other documents served on Defendants are a summons and Plaintiff's First Request for Production of Documents to Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC, attached as **Exhibit 3**. Defendants have provided the Court with all process, pleadings, and orders with which they have been served, in compliance with 28 U.S.C. § 1446(a).

7.      Pursuant to 28 U.S.C. § 1446(d), written notice of this removal (including a copy of this notice of removal) will be filed with the Circuit Court of the State of Oregon, County of Multnomah, and notice will be given to all adverse parties, promptly after the filing of the notice of removal with this Court.

## II.    FACTUAL BACKGROUND

### A.    INTRODUCTION

8.      The claim commenced by Plaintiff concerns alleged impacts to natural resources and environments in Oregon by polychlorinated biphenyls, also known as "PCBs" (Compl. ¶ 3). Specifically, it alleges that these impacts are due to the actions of one company: Old Monsanto[2] (Compl. ¶ 4).

9.      Plaintiff alleges that PCBs are fire resistant due to their high flash points, are minimally water soluble, chemically stable, possess excellent dielectric properties and were historically extensively used for industrial and commercial purposes, as well as in consumer products (Compl. ¶ 31).

10.     Old Monsanto sold PCBs in bulk, often under trade names such as "Aroclor," "Pydraul," "Interteen" and "Pyranol." Those PCBs were then incorporated into products manufactured by other companies or included as fluids enclosed in electrical components and other machinery. Old Monsanto never manufactured PCBs in Oregon.

11.     Old Monsanto manufactured PCBs in a number of contexts, including but not limited to:

        a.  in facilities financed by the federal government to meet the military's needs pursuant to "Necessity Certificates";

        b.  at the express direction and command of the federal government pursuant to the Defense Production Act;

---

[2] "Old Monsanto" is a predecessor to Pharmacia LLC, which, among others, allegedly manufactured PCBs from 1929 (more correctly 1935) to 1977. *See* Compl. ¶4. The Defendants are alleged to be Old Monsanto's successors or indemnitors. *See* Compl. ¶¶ 12 to 19.

    c.   as a direct contractor for multiple departments and agencies of the federal

        government;

    d.   for federal defense contractors who needed PCBs to meet exacting

        military specifications;

    e.   for uses required by federal OSHA regulations; and

    f.   supplying PCBs to facilities located in Oregon and elsewhere.

12.     In each of these contexts, Old Monsanto manufactured PCBs while acting under the color of federal officers or agencies. In addition, several areas that Plaintiff alleges are impacted are on or immediately adjacent to federal enclaves, where the federal government has exclusive jurisdiction.

13.     As a preliminary note, given the passage of time, Defendants do not have complete records dating back to the 1930s. Therefore, information provided regarding Necessity Certificates, sales invoices, and the like is necessarily representative rather than exhaustive, and consists of what Defendants have been able to locate in short order, without the benefit of formal discovery.

**B.     THE FEDERAL GOVERNMENT FINANCED THE EXPANSION OF OLD MONSANTO'S FACILITIES SO THAT OLD MONSANTO COULD PRODUCE MORE PCBS FOR THE MILITARY**

14.     In the lead-up to World War II, the federal government determined that an increase in PCB production was necessary for the national defense. In order to meet its increased military demands, the federal government funded multiple expansions of Old Monsanto's PCB-manufacturing facilities located in Alabama. Throughout this period, the majority of PCBs that Old Monsanto produced were for use by the U.S. military. These uses included coatings,

insulation materials, missile launch tubes, non-flammable wire coatings, banding and sheet rubber, heat-resistant paints, anti-fouling paints and electrical transformers.

15.    When produced for the military, PCBs were subject to specifications dictated by and approved for specific uses by the federal government. *See*, *e.g.*:

a.    A government specification approving the use of Aroclor 1254 in heat-resistant paint (**Exhibit 4**).

b.    An invoice for shipment of Therminol FR-1 to Loring Air Force Base, "Certified for National Defense under DMS Reg DOC9e" (**Exhibit 5**).

c.    Government-specified use of Aroclor 1242 in potting material for missiles (**Exhibit 6**).

d.    Invoices specifying the purchase of Pydraul #150 for use as a lubricant and Inerteen and Pyranol for use in transformers (**Exhibit 7**).

e.    Sales summaries from 1959 to 1960 showing the supply of Aroclor Pryanol 1470 to the United States Department of the Interior in Albany, Oregon (**Exhibit 8**).

f.    Sales summaries from 1968 to 1969 showing the supply of Pydraul A200 and Pydraul 312 to Zidell Machine Co ("Zidell") (**Exhibit 9**)., which has operated a scrap yard on the Portland, Oregon, waterfront since 1912.[3] Zidell historically had close ties to the US military, which used Zidell's

---

[3] See http://zidell.com/home/ (last accessed January 29, 2018). Defendants respectfully request that the Court take judicial notice of this website and the other publicly-available matter and materials cited in their Notice of Removal and Removal pursuant to Rule 201 of the Federal Rules of Evidence. *See* Defendants' Request for Judicial Notice in Support of Defendants' Notice of Removal of Entire Case to Federal Court Pursuant to 28 U.S.C. §§ 1331, 1441, 1442 (filed concurrently herewith).

property in Portland Harbor for the production of ships during World War II, and also dismantled a number of vessels there after World War II, at the request of the United States.[4]

16.     By mid-1941, Old Monsanto could not keep up with military demand for PCBs. On May 21, 1941, Old Monsanto submitted a request for issuance of a Necessity Certificate to the Secretary of War and the Advisory Commission to the Council of National Defense (**Exhibit 11**). The Necessity Certificate sought $275,000 from the government so that Old Monsanto could, solely for the Defense Program, expand its production of diphenyl (used in making PCBs) from 720,000lbs to 1,200,000lbs. *Id*. at pp. 2 and 4. Two days later, on May 23, 1941, the Advisory Commission sent the Application for Necessity Certificate to the Emergency Facilities Committee (**Exhibit 12**).[5] The application stated that 100% of the new facilities would be used for "Defense Purposes." *Id.* at p. 1.

17.     Federal officials from the Office of Production Management recommended 100% certification, stating: "Because of the need of this material in the defense program it is recommended that a Certificate of Necessity be granted 100% for the described facilities." *Id*. at 7. *See also id.* at pp. 1–2; 6. Major C. V. Morgan, Army Representative, Commodities Division, also recommended certification, stating "the additional facilities are necessary to the national defense," because chlorinated diphenyls "are used . . . in transformers and condensers . . . ." *Id*. at p. 4.

---

[4] See Zidell Entities' Third Party Complaint filed in *Arkema Inc. v. A & C Foundry Products, Inc. et al*, Case No. 3:09-CV-453-PK (D. Or. Oct. 1, 2009) (**Exhibit 10** at ¶¶ 5–10)

[5] Note that the application filed by the Advisory Commission requested $280,498 rather than $275,000, citing an error in the application's appendix (application attached here as Ex. 11). *See* Ex. 12 at p. 1.

18.    The federal government issued a Necessity Certificate on August 6, 1941

(**Exhibit 13** at p. 8). Other Necessity Certificates were also submitted and approved,[6] financing

expansions of Old Monsanto's Alabama facilities so that it could expand production of PCBs for

the military and defense contractors.

19.    During World War II, Old Monsanto worked closely with the U.S. government

regarding PCB production for the military. By 1942, 80% of Old Monsanto's plant in Anniston,

Alabama was devoted to the war effort, and the plant was nominated for and received multiple

Army-Navy "E" (Excellence) Awards for its support of the national defense (**Exhibit 17**).

C.    **Old Monsanto Continued to Produce PCBs Required to Meet Military**
      **Specifications for Decades**

20.    Old Monsanto continued to manufacture PCBs for the government and defense

contractors into the 1970s. Many products had exacting specifications for fire resistance, thermal

and electrical conductivity, and other attributes requiring the use of PCBs. *See* paragraph 15

*supra*.

21.    Military specifications continued to call expressly for Old Monsanto's PCB-

containing Aroclor products. For example, federal specification TT-P-28c for heat-resisting

---

[6] *See* Request for Issuance of Necessity Certificate dated July 16, 1941 to increase production of
Aroclors and noting that "the United States Navy requires cable covered with material containing
Aroclor" and that new facilities would double the production of Aroclors from 600,000 lbs. to
1,200,000 lbs., 100% of which was to be used in national defense (**Exhibit 14** at pp. 3, 4);
Application for a Necessity Certificate dated July 17, 1941 (explaining that new facility would
double production of Aroclors, 100% of increased production would be for "Defense Purposes"
and that the facilities were "necessary in the interest of national defense during the emergency
period") (**Exhibit 15** at pp. 1 and 9); issuance of Necessity Certificate dated September 24, 1941
(Ex. 13 at p. 8); Request for Issuance of Necessity Certificate dated November 27, 1941 to
increase production of Aroclors) (**Exhibit 16**); issuance of a Necessity Certificate dated March
13, 1942 (Ex. 13 at p. 8).

aluminum paint used by the military called for the use of Old Monsanto's Aroclor 1254, a PCB-containing product. *See* Fed. Spec. TT-P-28c (Sept. 22, 1961) (Ex. 4).

22.    Old Monsanto also manufactured Aroclor 1254 to military specifications for other products, including electrical wire and cable. *See*, *e.g.*:

> a.  Call Report for W. Clark dated June 2, 1970 (Old Monsanto produced Aroclor 1254 for defense contractor, Chemical Products, which "used [it] exclusively in cellulosic lacquer to meet military specifications for lacquer used in wire and cable applications") (**Exhibit 18**).

> b.  Call Report to F. Miller dated September 7, 1970 (Old Monsanto manufactured Aroclor 1254 for defense contractor, Marblette Company, which used it to meet specifications of a contract with the U.S. military for electrical wire) (**Exhibit 19**).

23.    It was not only Old Monsanto that was required to meet military specifications in relation to PCBs. In some instances, the contractors to which Old Monsanto supplied the product for military use "did not know what the Aroclor did or why—only that the military had approved it—and it was used without any questions" *(Id.* at p. 1).

### D.    The Federal Government Compelled Old Monsanto to Sell PCBs for Certain Uses in the 1970s

24.    After Old Monsanto decided in the early 1970s to terminate PCB manufacturing for certain applications like paint, adhesives and sealants, the federal government invoked the Defense Production Act to order Old Monsanto to manufacture PCBs for such uses by military contractors. *See* November 14, 1972 letter from J. Richards, U.S. Dept. of Commerce re: BDC Case 36397 to W. Papageorge, Monsanto Industrial Chemicals (directing Old Monsanto to

accept purchase orders for Aroclor 1242 "pursuant to Section 101 of the Defense Production Act of 1950") (**Exhibit 20**).

25.    Old Monsanto complied with the government's directive, but explained it had otherwise ceased selling PCBs "because of the increasing environmental concerns expressed about products containing polychlorinated biphenyls (PCBs) . . . for the uses which we understand [the defense contractors] intend for the Aroclor 1242 we have been directed to deliver." *See* November 17, 1972 letter from W. Papageorge, Monsanto Industrial Chemicals, to J. Richards, U.S. Dept. of Commerce re: BDC Case 36397 (**Exhibit 21**).

26.    The federal government convened an Interdepartmental Task Force in 1971, which in 1972 issued a report determining the continued use of PCBs to be "necessary" in certain electrical applications because no alternative product was available. *See* Interdepartmental Task Force on PCBs, ITF-PCB-72-1, Polychlorinated Biphenyls and the Environment (May 1972) (**Exhibit 22**). The report stated that the "use of PCBs should not be banned entirely," and the "continued use for transformers and capacitors in the near future is considered necessary because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use." *Id.* at 2–5, 81.

27.    In addition, the United States Atomic Energy Commission ("USAEC") directed Old Monsanto to sell heat transfer fluid PCBs in the 1970s to fulfill military defense needs despite Old Monsanto's warnings about potential hazards associated with PCBs. *See* March 28, 1972 Special Undertaking for Future Purchases of Polychlorinated Biphenyls Contained in Therminol FR-1® (A Trade Name of Monsanto Company) at p. 1 (**Exhibit 23**). The document states that the USAEC and its contractor deemed PCB "use in certain applications critical to the national defense," and concluded that "acceptable substitutes [were] not presently available." *Id.*

28.     The federal government continued to invoke the Defense Production Act to require Old Monsanto to sell PCBs to defense contractors for open uses through at least mid-1974. For example, in April 1973, Raytheon noted that the government had directed it to manufacture missiles, but it had refused to authorize Raytheon to use new materials that would avoid the use of PCBs. *See* Ex. 6 at p. 3. In doing so, Raytheon expressly acknowledged that "Monsanto in all of our dealings has expressed a *strong preference not to sell this product* to us and is proceeding with the sale *only at the direction of the government.*" Ex. 6 at p.3 (emphasis added). In July 1974, the federal government directed Old Monsanto to sell PCBs to Raytheon for open use (*see* letter to J. Morse, Monsanto Company, from J. Richards, U.S. Dept. of Commerce dated July 24, 1974 re Case No. 38407 (**Exhibit 24**) and letter from T. Gossage, Monsanto Co., to U.S. Dept. of Commerce dated August 6, 1974 re Case No. 38407 (confirming compliance with directive to sell PCBs to Raytheon) (**Exhibit 25**)).

29.     In fulfilling such orders, Old Monsanto warned federal officials and government contractors that based on new scientific understanding, PCBs could persist in the environment, that care was required in their handling, possession, use, and disposition, that tolerance limits had been or would be set for them, and that sale of the products had been discontinued. *See* Ex. 21, Ex. 23 and Ex. 25. Indeed, when the USAEC directed Old Monsanto to sell heat transfer fluid PCBs in the 1970s to fulfill military defense needs, Old Monsanto had both the USAEC and the government contractor acknowledge its warnings about potential hazards. *See* Ex. 23.

30.     Thus, while Old Monsanto tried to terminate or reduce its commercial PCB production, the federal government continued to require PCB production for purposes that benefitted the government.

E.   **Old Monsanto Worked Closely with the Federal Government to Stop PCB Production Where Acceptable Substitutes Were Available**

31.   From 1971 onwards, Old Monsanto worked hand-in-hand with the United States Environmental Protection Agency ("EPA") to determine when acceptable PCB substitutes would be available so Old Monsanto could terminate producing PCBs.

32.   In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601, et seq., regulating PCBs. Among other things, TSCA provided the EPA with broad power to promulgate a comprehensive regulatory scheme governing the manufacture, use, distribution, disposal, and remediation of PCBs. *See* 40 C.F.R. § 761.1, et seq.

33.   The TSCA barred new manufacture of PCBs after July 2, 1979, but delegated EPA the authority to allow continuing use of PCBs where there was not an "unreasonable risk of injury to health." *See* 15 U.S.C. § 2605(e). EPA allowed many continuing uses of PCBs based on findings that these uses did not present unreasonable health risks. *See*, *e.g.*, 40 C.F.R. § 761.20 (identifying permitted uses of PCBs).

III.   **THE REQUIREMENTS FOR REMOVAL ARE SATISFIED**

A.   **OLD MONSANTO PRODUCED PCBs WHILE ACTING UNDER COLOR OF FEDERAL OFFICERS AND AGENCIES AND IS ENTITLED TO A FEDERAL FORUM**

34.   The Complaint alleges that Defendants are liable for tort damages and economic losses associated with damage to natural resources because Old Monsanto, as the alleged predecessor to Defendants, manufactured and sold PCBs over a four-decade period that ended more than 40 years ago. Old Monsanto manufactured PCBs based on contracts with and orders from multiple agencies of the United States, including but not limited to, the Army, Navy, Air

Force, Department of Agriculture, Government Printing Office, Council on National Defense, Office of Production Management, Department of Commerce, National Aeronautics and Space Administration ("NASA"), and USAEC. *See* Ex. 4 and **Exhibit 26** (samples of invoices for direct sales to federal agencies).

35.    This Court, therefore, has jurisdiction under the provisions of 28 U.S.C. § 1442(a)(1) because this is a civil action brought against a person acting under color of an officer or agency of the United States. [7]

> ### *1.    The federal officer removal statute is broad and must be liberally interpreted*

36.    28 U.S.C. § 1442(a)(1) allows for removal of *any* civil action commenced in state court against "*any* officer (or *any* person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to *any* act under color of such office" (emphasis added). [8] It is "an incident of federal supremacy," *Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135, 1142 (11th Cir. 2017), intended to protect not just federal

---

[7] On January 12, 2017, Defendants removed a similar case filed by the State of Washington— entitled *State of Washington v. Monsanto Company, Solutia Inc., Pharmacia Corporation and DOES 1 through 100* (case number 16-2-29591-6 SEA)—from the Superior Court of the State of Washington for King County on similar grounds to those argued in this notice of removal. On July 28, 2017, Judge Robert Lasnik of the District Court for the Western District of granted the State of Washington's motion to remand. Order Granting State of Washington's Motion to Remand, *State of Washington v. Monsanto Company, et al.*, Case No. 2:17-cv-00053 (W.D. Wa. July 28, 2017). The Defendants have appealed that decision to the United States Court of Appeal for the Ninth Circuit pursuant to 28 U.S.C. §1291 arguing, *inter alia*, that the district court applied an improperly restrictive test when determining whether the Defendants had met their burden under § 1442 and failed to liberally construe §1442(a)(1) pursuant to Ninth Circuit authority.

[8] The statute defines a "civil action" to "include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order . . . is sought or issued." 28 U.S.C. § 1442(d)(1).

officers, but also "persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008). After all, "[i]f the federal government can't guarantee its agents access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006).

37.     The Supreme Court has instructed that the "words 'acting under' are broad, and . . . the [federal officer removal] statute must be 'liberally construed.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). It has also stated that "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) ("*Manypenny*") (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). The Ninth Circuit has recently reaffirmed this statement in *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) and not long ago also recognized that "defendants enjoy much broader removal rights under the federal officer statute than they do under the general removal statute." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (citing *Durham*, 445 F.3d at 1253).

38.     In 2011, the federal officer removal standard was amended to provide expressly that actions taken under the direction of a federal officer need only "relat[e] to" the act from which the civil actions arises (28 U.S.C. §1442(a)(1)).[9] This amendment was intended to broaden

---

[9] Prior to the amendment in 2011, a party seeking to remove a case under the federal officer statute had to show that it had been sued "for any act under color of [federal] office." 28 U.S.C. § 1442(a)(1) (2010). In other words, defendants had to "show a nexus, a 'causal connection' between the charged conduct and asserted official authority." *Jefferson County v. Acker*, 527

the statute's reach. *See Goncalves,* 865 F.3d at 1250 (noting that Congress enacted the amendment "because Congress felt that the courts were construing the statute too narrowly") and *In re Commonwealth's Motion to Appoint Counsel*, 790 F.3d 457, 467 (3rd Cir. 2015) ("*Commonwealth's Motion*") (citing legislative history which stated that the amendment was "intended to broaden the universe of acts that enable Federal officers to remove to Federal Court"). Circuit Courts have concluded that the phrase "relating to" requires nothing more than a "connection" or "association" between the act in question and the federal office. *See Caver*, 845 F.3d at 1144; *Commonwealth's Motion*, 790 F.3d at 471-72. Thus, while pre-amendment cases stressed that the nexus was a low bar, which is even clearer (and lower) post-amendment.

39.    In addition, it is not necessary that all controversies in the case involve a federal officer or agency—federal officer removal "authorizes the removal of an entire case, even though only one of its controversies might involve a federal officer or agency." *Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1051 (S.D. Ill. 2009) (citing *N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc.*, 719 F. Supp. 325, 334 (D.N.J. 1989)); *see Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.7 (6th Cir. 2010) (same); *AIG Europe (UK) Ltd. v. McDonnell Douglas Corp.*, No. CV-02-8703-GAF, 2003 WL 257702, at *1 (C.D. Cal. Jan. 28, 2003) (same); 14C Wright, Miller, Cooper & Steinman, *Fed. Prac. & Proc.* § 3726 (same). Further, the nexus need not exist for all of the

---

U.S. 423, 431 (1999) (internal quotations omitted). To satisfy this requirement of § 1442, defendants needed only to "demonstrate that the acts for which they [we]re being sued" occurred at least in part "because of what they were asked to do by the Government." *Isaacson*, 517 F.3d at 137. In assessing whether that nexus existed, courts were required to credit the defendant's theory of the case. *Leite*, 749 F.3d at 1124. As noted in paragraph 38 *supra*, the 2011 amendment is intended to broaden the reach of § 1442 (*Goncalves*, 865 F.3d at 1250). Thus, the threshold to prove that the action taken under color of federal office "relat[es] to" the act giving rise to the civil action must be even lower than the standard articulated in *Isaacson*, 517 F.3d at 137.

actions or all of the relevant time period, so long as it applies to some portion thereof. *See Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 711-712 (E.D. Tex. 1998).

### 2.    The Standard for Federal Officer Removal

40.    In the Ninth Circuit, a defendant is entitled to remove a case to federal court under 28 U.S.C. § 1442 where it can establish: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Goncalves*, 865 F.3d at 1244 (quoting *Durham*, 445 F.3d at 1251 and *Jefferson County v. Acker,* 527 U.S. 423, 431 (1999)). That showing need only be made by a preponderance of the evidence. *Leite*, 749 F.3d at 1124.

41.    When Old Monsanto manufactured PCBs, it did so in several ways that easily satisfy these requirements, particularly in light of the Supreme Court's deferential standard favoring removal under 28 U.S.C. § 1442. *See Manypenny*, 451 U.S. at 242. These include manufacturing PCBs at the express direction and command of the federal government pursuant to the Defense Production Act; as a direct contractor for multiple departments and agencies of the federal government, supplying PCBs to facilities located in Oregon and elsewhere; for federal defense contractors that needed PCBs to meet exacting military specifications; for uses required by federal OSHA regulations; and in facilities financed by the federal government to meet the military's needs pursuant to "Necessity Certificates." *See supra* paragraphs 14 to 30.

### 3.    Each Defendant is a Person for the Purposes of § 1442

42.    "[C]orporate entities qualify as 'persons' under § 1442(a)(1)." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998); *see also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("no indication that Congress meant to exclude

corporations [from Section 1442]") (internal quotations and citations omitted). Indeed, Courts of

Appeal have uniformly held that corporations, like Defendants, are "person[s]" under

§ 1442(a)(1). *See Goncalves,* 865 F.3d at 1244; *Commonwealth's Motion*, 790 F.3d at 467-68

(holding that § 1442(a)(1)'s use of the term "person" includes corporations); *Bennett v. MIS

Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (same); *Isaacson*, 517 F.3d at 135-36 (same); *see

also* 1 U.S.C. § 1 (defining "person" to include, unless the context indicates otherwise,

"corporations, companies, associations, firms, partnerships, societies, and joint stock companies,

as well as individuals"); *Watson*, 551 U.S. at 152-154 (using the term "private person" and

"company" interchangeably in the context of § 1442(a)(1), but holding that the defendant-

company could not remove the action). Thus, the first requirement for removal is met.

### 4.      There is a Causal Nexus Between Old Monsanto's Actions Taken Under Direction of Federal Officers and Plaintiff's Claims

**The "acting under" requirement is satisfied**

43.      A non-governmental entity acts under color of a federal officer or agency when its

actions "involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal

superior." *Watson*, 551 U.S. at 152 (emphasis in original). The Supreme Court has noted that an

example of a non-governmental entity "acting under" the federal government is "by providing

the Government with a product that it used to help conduct a war." *Id*. at 153–54. This "acting

under" requirement "covers situations…where the federal government uses a private corporation

to achieve an end it would have otherwise used its own agents to complete." *Ruppel*, 701 F.3d at

1181; *see also Bennett*, 607 F.3d at 1088 (company satisfied "acting under" requirement when

"in the absence of a contract with" the company, the government itself would have had to

perform the task). "The "acting under requirement" is also satisfied where a contractor seeks to

remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255 (emphasis in original); *see also, e.g.*, *Papp v. Fore-Kast Sales Co.*, *Inc.*, 842 F.3d 805, 813 (3d Cir. 2016) (Boeing's actions under a federal contract to produce military aircraft for the government sufficient to satisfy requirement that it act under a federal officer); *Ruppel*, 701 F.3d at 1181 (corporation that supplied the Navy with turbines satisfied the "acting under" requirement); *Isaacson*, 517 F.3d at 137-38 (enough that contractual relationship gave rise to Agent Orange contamination even if the contract did not call for it); *Gordon v. Air & Liquid Systems Corp.*, 990 F. Supp. 2d 311, 318 (E.D.N.Y. 2014) (causal nexus met where defendants "made their products because the Navy agreed to procure them," thus allowing "defendant's conduct to fall under the color of a federal office regardless of whether there were contractual terms concerning asbestos").

44.    As noted at paragraphs 8 to 33 *supra*, the U.S. federal government deemed Old Monsanto's PCBs essential to the national defense to help carry out multiple wars, starting with World War II. For decades, Old Monsanto produced PCBs for the federal government and its military contractors, to government specifications, often at facilities financed by the federal government to fulfill "national defense" needs during multiple wars, and it was recognized as a "subcontractor" by the federal government (Ex. 17 at pp. 3 and 5). These PCBs were so necessary to the national defense that the federal government compelled their production even after Monsanto sought to terminate their production in the 1970s (see paragraphs 24 to 30 *supra*).

45.    Numerous other agencies of the federal government purchased PCBs over many years to advance military, space exploration, and other government interests. Various communications reflect that the federal government would not accept a product unless it contained PCBs. *See*, *e.g.*, Ex. 23.

46.     The U.S. government was, therefore, more than just a significant consumer of PCBs—the U.S. government through its officers and agencies *required* Old Monsanto to manufacture PCBs. Thus, Old Monsanto's production of PCBs for the federal government is a clear and straightforward example of someone acting pursuant to a federal officer's direction.

**There is a sufficient causal nexus**

47.     To satisfy 28 U.S.C. § 1442, a defendant need only show that the act that is the subject of the plaintiff's attack "occurred *while* Defendants were performing their duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original) (even if plaintiffs were to prove that dioxin contamination occurred because of an act not specifically contemplated by the government contract, it is enough that the contracts gave rise to the contamination); *see also Willingham*, 395 U.S. at 409; *Gordon*, 990 F. Supp. 2d at 318 (causal nexus satisfied where defendants showed that they "made their products because the Navy agreed to procure them"); *Despres v. Ampco-Pittsburgh Corp.*, 577 F. Supp. 2d 604, 609 (D. Conn. 2008) (causal nexus satisfied by defendant's assertions that the use of asbestos occurred while defendant was carrying out Navy-directed duties). That is, "[i]t is enough that his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution." *State of Maryland v. Soper*, 270 U.S. 9, 33 (1926).

48.     Accordingly, defendants have only to show "that the challenged acts 'occurred *because* of what they were asked to do by the Government.'" *Goncalves*, 865 F.3d at 1245 (quoting *Isaacson* 517 F.3d at 137; emphasis in original). In addition, Ninth Circuit precedent holds that the court is to "credit the defendant's theory of the case" in "assessing whether a causal nexus exists." *Leite*, 749 F.3d at 1124.

49.    The Complaint contends that Defendants, as the successors to Old Monsanto, are liable under numerous causes of action due to the manufacture and use of PCBs by Old Monsanto between 1929 (more correctly 1935) and 1977. Compl. ¶ 4. During this more than four-decade time period, Old Monsanto manufactured and sold PCBs directly to the U.S. Army, U.S. Navy, U.S. Air Force, Tennessee Valley Authority, U.S. Department of Agriculture, U.S. Government Printing Office, NASA, and USAEC. *See* Ex. 8, Ex. 9 and Ex. 26 (samples of invoices for direct sales to federal agencies, including sales within Oregon). Thus, Plaintiff's claims are "for" the very acts that Old Monsanto performed under color of federal office.

50.    Plaintiff also claims that "many of Oregon's natural resources and environments are contaminated with [PCBs]." Compl. ¶ 3. In an attempt to avoid this Court's jurisdiction, it seeks to limit its Complaint by claiming that it does not seek damages for PCBs that Old Monsanto supplied to the federal government under color of federal officers.[10] *See* Compl. ¶ 26. However, it does not otherwise attempt to distinguish between PCBs that may have leached or leaked from one type of product or application versus another. It does not specify which finished products were the source of PCBs released into the environment that allegedly have contaminated the Oregon waterways or other areas enumerated in paragraphs 90, 102, 104 and 105 of the Complaint. It does not allege which third parties are responsible for releasing the PCBs that have allegedly contaminated Oregon's natural resources and environment. Therefore, Plaintiff's claims necessarily embrace PCBs sold by Old Monsanto to the federal government as, based on limited facts known to date, it is not possible to distinguish one PCB from another.

---

[10] This is addressed at paragraphs 103 to 110.

*Portland Harbor*

51.     The State alleges that Portland Harbor—identified as a "Superfund Site" and placed on the National Priorities List—has been impacted by PCBs. The State has "spent millions of dollars in defense and investigation costs related to the presence of PCBs in the Portland Harbor" and faces "significant" additional potentially liability at that site, including due to the State's own identification as a Potentially Responsible Party by the EPA.[11] Compl. ¶¶ 25, 90(a), 91-98. It is incontrovertible that the U.S. government and military played a key role in the alleged PCB contamination in the Harbor.

52.     PCBs are identified as common byproducts associated with ship building, salvaging, maintenance, and repair.[12] During the World War II years—squarely within the time Old Monsanto is alleged to have manufactured and sold PCBs to the federal government—the United States conducted an extraordinary campaign to build, repair, and maintain a variety of war ships and vessels in Portland Harbor, predominantly for use by the U.S. Navy, U.S. Army,

---

[11] See paragraphs 78 to 79 and 92 to 101 below for a discussion of this issue.

[12] *See* EPA, *Portland Harbor RI/FS, Remedial Investigation Report* at 3-68, 10-6 (Feb. 8, 2016) (**Exhibit 27**); US Army Corps of Engineers, *Final Remedial Investigation Report* at 3-7–3-9, 6-5–6-6 (May, 2010) (**Exhibit 28**). *See* Defendants' Request for Judicial Notice in Support of Defendants' Notice of Removal of Entire Case to Federal Court Pursuant to 28 U.S.C. §§ 1331, 1441, 1442 (filed concurrently herewith). Government websites, like that of the EPA, are properly subject to judicial notice because they are recognized as a source of reliable documentation. *See, e.g., L'Garde, Inc. v. Raytheon Space & Airborne Sys., 805* F. Supp. 2d 932, 937 (C.D. Cal. 2011) (granting judicial notice of record searches from the California Secretary of State website); *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG, 2009 WL 6597891, at *1 (S.D. Cal. Dec. 23, 2009) (holding that pages printed from FDA website were "similarly reliable to other traditional public documents"); accord *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc*., 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from FDIC's official website).

U.S. Maritime Commission, and War Shipping Administration.[13] Following World War II,

Portland Harbor fueled Portland's economy through salvaging, repairing, dismantling, and

storing U.S. military ships and vessels.[14] Some construction and repair of U.S. military vessels

also continued in Portland Harbor after World War II,[15] while other facilities on the Harbor, such

as the U.S. Army Corps of Engineers' Moorings facility, have been building, repairing, or

maintaining U.S. vessels on the Harbor virtually uninterrupted since the early 1900s.[16]

      53.    These efforts, undertaken at the direction of the United States through its agencies

and military, have undeniably contributed to the presence of PCBs in Portland Harbor at the

following sites (at a minimum): Albina Engine and Machine Works property, Willamette Iron

and Steel Company ("WISCO") property, Oregon Shipbuilding Corp. property, U.S. Shipping

Board property, St. Johns Dry Docks (also called the Port of Portland Dry Docks), Peninsula

Ship Building Co. property, Swan Island (U.S. Maritime Commission), American Ship

Dismantlers property, Gunderson Brothers Engineering Group property, Zidell Exploration

Company property, Consolidated Builders, Inc. property, Willamette Cove, Mar Com, Triangle

Park, U.S. Moorings property, Premier Edible Oils property, Time Oil property, and Terminal

4/International Slip.[17]

---

[13] *See* Ex. 27 at 3-58–3-63, 3-66–3-68, Table 3.2-1 at 2; 4-9, Oregon Department of Environmental Quality, *Portland Harbor Upland Source Control Summary Report* at 25-85 (Mar. 25, 2016) (**Exhibit 29**); Housing Authority of Portland, *It Takes More Than Bullets, The WWII Homefront in Portland*, Oregon at 4-1–4-17 (Dec. 2006) (**Exhibit 30**).

[14] Ex. 27 at 3-59–61, 3-63, 3-67–3-68, Table 3.2-1 at 2, 7-9; Ex. 29 at 25-85; Ex. 30 at 8-1–8-5.

[15] Ex. 27 at 3-67–68, Table 3.2-1 at 5, 7; Ex. 29 at 25.

[16] Ex. 28 at 2-5.

[17] Ex. 27 at 3-58–3-63, 3-67, Table 3.2-1 at 2, 4-9; Ex. 29 at 25-85

54.    The State does not and cannot distinguish between the "presence of PCBs in the Portland Harbor" for which it has allegedly "spent millions of dollars in defense and investigation costs" owed to the extensive activity of the U.S. government in the Harbor and those PCBs used strictly by non-federal entities. The conduct for which the State of Oregon is suing Defendants—Old Monsanto's act of manufacturing PCBs—is, therefore, identical to and has a causal nexus with the acts Old Monsanto took under color of federal office.

*Federal Government Operations at Other Relevant Sites*

55.    The State also seeks recovery of costs allegedly incurred to investigate, monitor, and detect the presence of PCBs in various "other state-owned waterways," and to conduct "PCB-related removal and/or remediation activities" at 14 specified "orphan sites."[18]  Compl. ¶ 99, 101-103.  However, at least nine of the 13 "other state-owned waterways" and four of the 14 "orphan sites" specified in the Complaint involve PCBs resulting from federal government operations, and the State has not (and cannot) distinguish between costs incurred to address PCB impacts caused by federal versus non-federal sources.

*The Lower & Middle Columbia River and the Columbia Slough*

56.    The State seeks damages for costs allegedly incurred to investigate, monitor and detect "elevated levels of PCBs" in a roughly 287-mile stretch of the Columbia River.  Compl. ¶¶ 99, 99(a), 99(b).  However, that same stretch of river contains PCBs commingled from

---

[18] Note that although the Complaint describes these various water bodies and sites as distinct locations, there is actually substantial overlap among them—for example, Portland Harbor RM 1-7, Orphan Site No. 139 RM 5, Orphan Site No. 277 RM 8, Orphan Site No. 2352 RM 6, Columbia River RM 101 and the Willamette River Sediment Study area RM 12-16 all appear to be located within the Willamette River RM 0-72. Likewise, the Columbia River RM 0-287 appears to include all or part of the Columbia Slough, and Orphan Sites 88, 1370 and 2251. The State should not permitted to double count or otherwise multiply damages for these overlapping sites.

multiple federal government sources, including at least three PCB-laden hydroelectric dams operated by the U.S. Army Corps of Engineers ("USACE")[19] deemed "crucial to the World War II military effort."[20] "[H]istorically, many pieces of electrical equipment used to generate power at dams in the Columbia River Basin used cooling and insulating oil that contained PCBs."[21] These federally-operated facilities discharged PCBs to the Columbia River, directly contributing to the "elevated levels of PCBs" of which the State complains.  For example, in 1988 a transformer explosion at the McNary Dam spread approximately 70 gallons of PCB-containing oil over the yard.[22]  In 2013, USACE was the subject of a Clean Water Act citizen suit based on USACE's "unpermitted discharges of pollutants from Bonneville Dam, John Day Dam and McNary Dam located on the Columbia River," and its "history of both acute and chronic leaks of pollutants into the Columbia River and Snake River"—including the discharge of "over 1,500 gallons of PCB-laden transformer oil at the Ice Harbor Dam on the Snake River."[23]

---

[19] These are the Bonneville, John Day and McNary Dams. *See* U.S. Department of the Interior Bureau of Reclamation, Federal Columbia River Power System Biological Opinion Hydrosystem, https://www.usbr.gov/pn/fcrps/hydro/index.html (last accessed January 29, 2018) (depicting USACE dams in the Columbia River Basin). Regarding PCB contamination, *see* EPA, Columbia River Basin: State of the River Report for Toxics at 22 (Jan. 2009) (**Exhibit 31**) (noting Bradford Island at Bonneville Dam as a known PCB disposal site in the Lower Columbia River).

[20] William F. Willingham, Ph.D., *Water Power in the Wilderness – The History of the Bonneville Lock and Dam* (**Exhibit 32**) at 43 (in respect of the Bonneville Dam).

[21] Ex. 31 at 22.

[22] Oregon Department of Environmental Quality, Environmental Cleanup Site Information Database Site Summary Report for McNary Dam Substation, http://www.deq.state.or.us/lq/ECSI/ecsidetail.asp?seqnbr=520 (last accessed January 29, 2018)

[23] Complaint, *Columbia Riverkeeper v. United States Army Corps of Engineers*, 3:13-cv-01310-ST (D. Or. 2013) (**Exhibit 33**) at ¶ 1 and Ex. 1, pg. 2. *See also*, Settlement Agreement, Columbia Riverkeeper v. United States Army Corps of Engineers, Case Nos. 2:13-md-02494-LRS at 1-2, 5-9 (**Exhibit 34**).

57.     For forty years, until 1983, USACE also operated "an unregulated landfill" which discharged PCB-containing electrical equipment directly into the Columbia River, causing elevated PCB concentrations in sediment, clams and crayfish tissue.[24]  Diver surveys of the river bottom adjacent to the landfill identified three areas of PCB-containing electrical debris."[25] "Representative pieces (capacitors, ballasts, and lightning arrestors) were recovered by divers and tested for PCBs. All electrical equipment tested contained PCBs with typical concentrations ranging between 8–12 mg/kg. One recovered capacitor contained residual oil containing 200,000 mg/kg PCBs."[26] A subsequent diver survey of one of the debris piles further identified "approximately 60 electrical items."[27]

*Coos Bay, Mill Creek, Pringle Creek, and Middle Fourth Creek*

58.     The State also seeks damages for costs allegedly incurred to investigate, monitor and detect "elevated levels of PCBs" in Coos Bay, Mill Creek, Pringle Creek, and Middle Fourth Lake.  *See* Compl. ¶¶ 99, 99(c), (h), (i), and (k).  However, like Portland Harbor, the presence of PCBs in these water bodies is the result of wartime shipbuilding and other industrial efforts undertaken at the direction of the United States through its agencies and military.  For example, numerous shipyards—including Hillstrom Shipyard, which built ships for the Army during World War II[28]—have been identified by the Oregon Department of Environmental Quality as

---

[24]  Oregon Department of Environmental Quality, Environmental Cleanup Site Information Database Site Summary Report for Bradford Island Landfill, http://www.deq.state.or.us/lq/ECSI/ecsidetail.asp?seqnbr=2010 (last visited Jan. 29, 2018).

[25]  Note 24 *supra*.

[26]  Note 24 *supra*.

[27]  Note 24 *supra*.

[28]  The Oregonian, *Coast Shipyards Turn Out Craft* (Mar. 24, 1943) (**Exhibit 35**) (discussing

potential sources of PCBs to Coos Bay.[29]  Likewise, Pringle Creek (formerly named South Mill

Creek) is a heavily industrialized area that has historically housed PCB-discharging pulp and

paper mills, such as Oregon Pulp & Paper, which provided timber for aircraft manufacturing

during World War II.[30]  Federal contractors have also conducted significant shipbuilding

operations at the direction of the federal government and pursuant to military specifications in

industrial areas in the vicinity of the Columbia Slough[31] and Middle Fourth Lake.[32]

---

Hillstrom's construction of five powered barges for the Army).

[29] Oregon Department of Environmental Quality, Environmental Cleanup Site Information
Database Site Summary Report for Coos Bay Area Sediment Contamination,
http://www.deq.state.or.us/lq/ECSI/ecsidetail.asp?seqnbr=1712 (last visited Jan. 29, 2018)
(identifying five shipyards as Coos Bay PCB sources); Oregon Department of Environmental
Quality, *South Coast Basin Water Quality Status and Action Plan* (Dec., 2013) (**Exhibit 36**) at
57; Oregon Department of Environmental Quality, Environmental Cleanup Site Information
Database Site Summary Report for Hillstrom Shipyard,
http://www.deq.state.or.us/lq/ECSI/ecsidetail.asp?seqnbr=1174 (last visited Jan. 29, 2018)
(noting waste at Hillstrom may contain PCBs).

[30] The Oregonian, *Pulp and Paper Mills Help Aircraft Builders Find Logs* (Feb. 22, 1943)
(**Exhibit 37**); EPA, *PCBs Involvement in the Pulp & Paper Industry*, (Feb. 25, 1977) (**Exhibit
38**) at 3 ("It has been recognized for several years that effluents from paper mills contain
environmentally significant quantities of PCBs.").

[31] The Oregonian, *Portland Shipyard…Oregon's Largest* (Apr. 6, 1941); The Oregonian,
*Willamette Lands Contracts* (Apr. 6, 1941); The Oregonian, *Commercial Iron Works…Anti-Sub
Net Tenders* (Apr. 6, 1941); The Oregonian, *Albina Making Submarine Chasers* (Apr. 6, 1941)
(**Exhibit 39**).

[32] Albany Democrat-Herald, *Wah Chang Celebrates 50 Years of History* (Sept. 16, 2006),
http://democratherald.com/news/local/wah-chang-celebrates-years-of-history/article_10cc3178-
bb72-533f-b89c-82213669caf4.html (last accessed Jan. 29, 2018) (discussing Wah Chang's
extensive manufacturing operations for military and nuclear energy uses in Millersburg, the town
adjacent to Fourth Lake).

*Orphan Sites 88, 277, 1703 and 1906*

59.     The State also seeks to recover "significant remediation costs associated with cleanup activities" conducted by the Oregon Department of Environmental Quality on certain designated orphan sites (Compl. ¶¶ 102-103) with significant federal connections.

60.     Orphan Site No. 1703 (designated Burns Air Force Station) is a former U.S. Air Force Station with significant legacy PCBs stemming from its federal military use.[33]  This Station was operated by the Air Force from the mid-1950s to 1970 and was used as an Aerospace Defense Command site, with the primary function of maintaining and monitoring radar equipment for aerospace defense.[34]  Studies of the site have found evidence of PCBs in the area, with suspected sources being several damaged and leaking transformers (some damaged by bullet holes), PCB-stained floors and areas underneath several buildings, including the radome (a structure built to protect radio equipment).[35]  In fact, PCB removal activities at the site conducted by the EPA resulted in the removal of approximately "200 tons of PCB-contaminated soil and debris."[36] As the U.S. Air Force was responsible for the development of the Station and

---

[33] Oregon Department of Environmental Quality, Site Summary Information for Burns Air Force Station, http://www.deq.state.or.us/Webdocs/Forms/Output/FPController.ashx?SourceIdType=11&SourceId=1703 (last accessed Jan. 29, 2018).

[34] *See* Oregon Department of Environmental Quality, *Burns Asbestos Removal Action, Removal Action Report, Former Burns Air Force Radar Range, Harney County, Oregon*, TDD: 04-06-0001 (Dec., 2004) (**Exhibit 40**) at 1-1. After the 1970s, it was transferred to a variety of local and federal agencies, and most of the site is now under private ownership. *Id.*

[35] *See* Ex. 40 at 2-5, 2-6 and 3-15.

[36] *See* note 33 *supra.*

the construction of the impacted buildings,[37] it is highly plausible that the U.S. military and government played an integral role in PCB conditions in the area.  Indeed, in circumstances where Plaintiff alleges that Old Monsanto was the only company manufacturing PCBs in the United States during the relevant period (*see* Compl. ¶ 4), it is highly likely that the U.S. Air Force ordered or caused Old Monsanto to supply PCBs to this site.

61.    Similarly, Orphan Site 88 (designated as Nuway Oil Company) was an oil refiner that was one of only two facilities in Oregon that accepted and processed used oil from military facilities.[38]  Notably, military departments and defense agencies were instructed to "sell as much oil as possible . . . to re-refiners."[39]

62.    Orphan Site No. 277 is entirely duplicative of another site referenced in the Complaint, Triangle Park in Portland Harbor, and as described above Portland Harbor was associated with significant wartime activities, involving PCBs, for the U.S. military.

*Watersheds*

63.    Plaintiff also alleges that PCBs have been detected in the tissue of various fish and wildlife species throughout Oregon, and specifies a number of watershed areas in which this has occurred. *See* Compl. ¶ 105.

---

[37] *See* Ex. 40 at 2-4.

[38] USACE Technical Report N-135, Reuse of Waste Oil at Army Installations at 15, 31 (Sept. 1982) (**Exhibit 41**) at 15 and 31.

[39] Ex. 41 at 15 and 31. *See also* Memorandum from Donald J. Horan (Director, U.S. General Accounting Office) to the Secretary of Defense dated September 17, 1982 (**Exhibit 42**) (indicating that military departments and defense agencies should "maximize the sale of used lubricating oil for the purpose of re-refining" at p. 1).

64.    In the limited time available to Defendants, eight federal facilities have been identified in the Coast Fork Willamette, Lower Willamette, Middle-Columbia-Hood, Middle Willamette and Umatilla watershed areas—each of which is specified in Plaintiff's claim. *See* Compl. ¶ 105; Declaration of Alexandra Kennedy-Breit ("Kennedy-Breit Decl.") at Exhibits A and B.

65.    This shows that the presence of PCBs in a number of the watershed areas specified in the Complaint was the result of federal government operations. Plaintiff has not—and cannot—distinguish between the presence of PCBs caused by federal versus non-federal sources in these areas.

### 5.    *Defendants Have Substantial and Colorable Defenses*

66.    Defendants assert significant and, at a minimum, colorable federal defenses based on the government contractor defense, the Defense Production Act and federal preemption (express and implied). Essential to the analysis under the "colorable defense" prong is that "one of the most important reasons for removal is to have the validity of the defense . . . tried in a federal court." *Willingham,* 395 U.S. at 407. This rule is anchored in the fundamental purpose of the statute: "to protect federal officers from interference by hostile state courts." *Id*. at 405. "State-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials," and the same considerations may apply when "a private person acts as an assistant to a federal official." *Watson*, 551 U.S. at 150–51.

67.    In order to satisfy this requirement, "[t]he officer need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407. That is, the defense need only be colorable. *See id*. "In deciding whether a defendant has such a defense, courts reject a 'narrow, grudging interpretation;' they do not require that the defense is likely to be successful on the merits." *In re*

"*Agent Orange*" *Prod. Liab. Litig.*, 304 F. Supp. 2d 442, 449 (E.D.N.Y. 2004) (citing *Jefferson County*, 527 U.S. at 431). It does not require a defendant to "virtually win his case, nor must his defense even be 'clearly sustainable' on the facts." *Cuomo v. Crane Co.*, 771 F.3d 113, 115—116 (2d Cir. 2014) (internal quotations and citations omitted). "Unless the substantive defense by the federal officer is completely frivolous, he is entitled to have the merits of such defense decided in federal court." 16 Fed. Proc., L. Ed. § 40:821 (citing *Williams v. Brantley*, 492 F. Supp. 925 (W.D.N.Y. 1980), judgment aff'd, 738 F.2d 419 (2d Cir. 1984). "But definitive proof is not necessary for removal" instead the removing party need only assert "a not-insubstantial and non-frivolous basis" for a federal defense. *Zeringue v. Crane Company*, 846 F.3d 785, 792 (5th Cir. 2017).

68.    Protecting Defendants and their federal defenses is paramount here, where the State of Oregon itself is a plaintiff and seeks to recover damages from Defendants in an Oregon state court proceeding, at least in part, in its role as trustee for all natural resources in its borders, which it holds for the benefits of its citizens. *See* Compl. ¶ 9 ("The State brings this action in its sovereign capacity as trustee for all natural resources within its borders, which it holds and protects for the benefit of all Oregonians") and ¶ 24 ("The State also brings this action in *parens patriae* capacity and thereby acts on behalf of all Oregonians affected by the presence of PCBs in Oregon's environment"). Congress and the Supreme Court's concerns for prejudice arising from local residents are not hypothetical in this suit involving alleged environmental contamination—it is a clear case of a home-court advantage for Plaintiff. Defendants, therefore, need and are entitled to the protection of a federal forum to hear their defenses. *See Watson*, 551 U.S. at 150.

**Government Contractor Defense**

69.    Old Monsanto's manufacture of PCBs pursuant to government contracts and specifications creates a compelling and colorable federal defense.

70.    The government contractor defense applies when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988). The defense applies here because Defendants can satisfy each prong.

71.    *First*, PCBs that Old Monsanto manufactured for the federal government all had reasonably precise specifications for particular uses by the federal government. *See*, *e.g.*, Ex. 4 (government specification approving use of Aroclor 1254 in heat-resistant paint); Ex. 5 (invoice for shipment of Therminol FR-1 to Loring Air Force Base, "Certified for National Defense under DMS Reg DOC9e"); Ex. 6 (government-specified use of Aroclor 1242 in potting material for missiles); Ex. 7 (invoices specifying purchase of Pydraul #150 for use as lubricant, Inerteen for use in transformers, and Pyranol for use in transformers). To satisfy this element, it is not necessary for the product supplied to be specially-designed by the military with no input from the manufacturer. Indeed, the Ninth Circuit has expressly rejected that argument. *See McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 450 (9th Cir. 1983) (rejecting plaintiff's argument that the government contractor defense "is only available where the specifications in the contract leave no discretion to the supplier in the formulation of the product's design"). Instead, "all that is necessary on this element of the defense is for defendant to prove that the product it supplied was a particular product specified by the government." *In re Agent Orange Prod. Liab. Litig.*, 534 F. Supp. 1046, 1056 (E.D.N.Y. 1982).

72.     Here, the Department of Defense expressly included PCBs in product specifications and on product order forms because of their performance characteristics. *See* AL/OE-TR-1996-0153, U.S. Air Force Armstrong Laboratory: *Risk Assessment of Polychlorinated Biphenyls (PCBs) On-Board Navy Ships* (Dec. 1996) at 1 ("PCB articles were selected for their performance characteristics including fire retardant properties") (**Exhibit 43**). Indeed, PCBs were specified, approved, and used extensively because of their unique properties, properties Plaintiff concedes (*see* Compl. ¶31), which were unavailable to the military and other federal agencies in other products or components. *See*, *e.g.*, Ex. 23 at p. 1 (USAEC and its contractor deemed PCB "use in certain applications critical to the national defense," and felt that "acceptable substitutes [were] not presently available.").

73.     *Second,* the various PCBs manufactured by Old Monsanto and sold to the federal government or at its direction met all applicable product specifications and satisfied government-required inspections. *See*, *e.g.*, Ex. 5 (sales invoice to Loring Air Force Base (Apr. 16, 1971), noting certification for national defense under DMS Reg L DOC9E, and contractor responsibility for performing inspections and tests required to substantiate that supplies and services provided meet military specifications). As discussed above, Old Monsanto received commendations from the military and the Army-Navy "E" Awards based, in part, on satisfaction of government performance standards. *See supra* paragraph 19, Ex. 17.

74.     *Third*, Old Monsanto was not aware of dangers related to PCBs that were not known to the government. "The third prong does not require contractors to warn the government of dangers already known to the government." *See In re "Agent Orange" Prod. Liab. Litig.*, 304 F. Supp.2d 404, 435 (E.D.N.Y. 2004). But, even so, Old Monsanto included warnings in communications with the government regarding PCBs. *See, e.g.,* Ex. 21 (Nov. 17, 1972

correspondence from W. Papageorge, Monsanto Company, to J. Richards, U.S. Dept. of Commerce warning of environmental concerns and explaining need for care in handling, possession, use, and disposal of PCBs; and noting food tolerance levels were then being established).

75.     As in *Boyle*, the purported state-imposed duty in this case—to hold Defendants responsible for Old Monsanto's manufacturing of PCBs—is "precisely contrary" to the duty imposed by the government contract. *Boyle*, 487 U.S. at 509. Because evidence establishes that (1) the federal government approved reasonably precise specifications calling for PCBs; (2) Old Monsanto provided PCBs that conformed to those specifications; and (3) Old Monsanto provided safety information to the government, which was already aware of the risks associated with PCBs, Defendants, as the alleged successors, have a colorable government contractor defense and are entitled to a federal forum in which to present it. *See Boyle*, 487 U.S. at 512.

**Defense Production Act**

76.     The Defense Production Act provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid." 21 U.S.C. § 4557. Here, the State is suing Defendants for Old Monsanto's manufacture and supply of PCBs that were demanded by federal officers pursuant to the Defense Production Act. *See* Ex. 20 and Ex. 24. (Department of Commerce officials ordering Old Monsanto to accept purchase orders "pursuant to Section 101 of the Defense Production Act of 1950"). Here, federal officers issued directives to Old Monsanto under threat of criminal prosecution pursuant to the Defense Production Act to manufacture and supply PCBs and Old

Monsanto complied with those directives. *See* Exs. 20, 21, 24, 25. Because the Plaintiff seeks to hold Defendants liable as Old Monsanto's successors for complying with the government's mandates under the Defense Production Act, Defendants have a colorable federal defense under 21 U.S.C. § 4557.

**<u>Express and Implied Preemption</u>**

77.    The federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) provides an additional basis of pre-emption. Plaintiff seeks to recover investigation and remediation costs for which CERCLA provides a comprehensive scheme through which potentially responsible parties are identified and damages apportioned among them. Thus, this suit frustrates the objectives and purposes of CERCLA by seeking to evade and undermine the comprehensive, detailed statutory scheme that Congress created to determine and allocate responsibility for cleanup costs among multiple parties. *See Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 943 (9th Cir. 2002) (CERCLA preemption will be found where "state law stands as 'an obstacle to the accomplishment and execution of [CERCLA's] full purposes and objectives'") (quoting *Calif. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987)).

78.    This point is particularly acute in this case, where Plaintiff seeks damages for the costs it alleges it has and will incur to investigate, monitor, and remediate PCBs in the Portland Harbor Superfund Site ("Superfund Site").  Compl. ¶¶ 89, 97-98, 111, 115, 119, 121, 128, 132, 135, 140, 143.  The State is a potentially responsible party ("PRP") under CERCLA at the Superfund Site and "faces significant potential [CERCLA] liability for cleanup costs in the Portland Harbor, and has already spent millions of dollars in defense and investigation costs related to the presence of PCBs [and other contaminants] in the Portland Harbor."  Compl. ¶¶ 97-

98, 132. Moreover, the State is a participant in the CERCLA allocation process currently underway among PRPs at Portland Harbor.[40]

79.    Courts have long held that CERCLA preempts state tort and unjust enrichment claims seeking the same or overlapping costs at issue in CERCLA's allocation process—the very claims the State brings here. *See XDP, Inc. v. Watumull Props. Corp.*, No. 99-1703-AS, 2004 WL 1103023, at *9 (D. Or. May 14, 2004) (finding common law claims for restitution, indemnification, nuisance, trespass, and negligence were pre-empted because the plaintiffs were seeking compensation for the same removal costs that were available under CERCLA); *Matter of Reading Co*., 115 F.3d 1111, 1117, 1120 (3d Cir.1997) (noting that Congress intended 42 U.S.C. § 9613 to be the sole means of recovery of contribution for CERCLA response costs and finding plaintiffs common law claims for contribution and restitution preempted); *Cyprus Amax Minerals Co. v. TCI Pac. Communs., Inc*., No. 11-CV-0252-JED-PJC, WL 6238485, at *8 (N.D. Okla. Dec. 3, 2013) ("Cyprus' unjust enrichment claim, as pled, seeks to recover only damages resulting from the cleanup it was required to perform under CERCLA and the 2009 Consent Decree. The unjust enrichment claim thus would undermine the § 113 settlement framework intended by Congress, as permitting such a claim would allow Cyprus to seek recompense for its CERCLA costs outside the limitations and conditions of CERCLA.") (internal quotation marks and citations omitted); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc*., 596 F.3d 112, 139 (2d Cir. 2010) ("We also hold that the state law claims for unjust enrichment are preempted . . .

---

[40] Proposed Amicus Curiae's Memorandum in Support of Motion for Leave of Court to File Amicus Memorandum filed by the State of Oregon, *Arkema, Inc. v. Anderson Roofing Co. Inc. et al.*, Case No. 3:09-cv-00453-PK (D. Or. Apr. 23, 2009) (**Exhibit 44**) at p. 1; Amicus Memorandum in Support of Referral to Alternative Dispute Resolution and the Issuance of a Stay filed by State of Oregon *Arkema, Inc. v. Anderson Roofing Co. Inc. et al.*, Case No. 3:09-cv-00453-PK (D. Or. Apr. 23, 2009) (**Exhibit 45**) at pp. 1–2.

allowing unjust enrichment claims for CERCLA expenses would again circumvent the

settlement scheme, as PRPs could seek recompense for a legally unjustifiable benefit outside the

limitations and conditions of CERCLA."); *Appleton Papers Inc. v. George A. Whiting Paper

Co.*, 901 F. Supp. 2d 1113, 1115-16 (E.D. Wis. 2012), *aff'd sub nom. NCR Corp. v. George A.

Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014) (finding plaintiffs' state law tort claims

preempted because "[a]llowing the Defendants to obtain through state law claims what they

failed to achieve through CERCLA would undermine CERCLA's complex scheme for

apportioning the expenses that arise from a cleanup action. . . .  [T]he costs at issue arose under

CERCLA and were subject to reallocation through contribution. This is true whether the claims

are described as torts, nuisance or contribution claims.  As such, a state law claim purporting to

achieve a different allocation of those same funds would pose a conflict [and are thus

preempted].").  Plaintiff's suit frustrates the objectives and purposes of CERCLA by seeking to

evade and undermine the comprehensive, detailed statutory scheme that Congress created to

determine and allocate responsibility for cleanup costs among multiple parties. Thus, it is

preempted by CERCLA.

80.    Plaintiff also seeks to recover natural resource damages for "all natural resources

situated within its borders," Compl. ¶ 87, which is in direct conflict with the natural resource

damages provisions of CERCLA. 42 U.S.C. § 9607(f) (setting forth requirements as to liability

for natural resource damages, prescribed uses for funds recovered for natural resource damages,

involvement of both federal and state trustees of such resources, and limitations on double

recovery of natural resources).  Specifically, the Complaint seeks an unrestricted claim for

natural resource damages.  *See* Compl. ¶¶ 3, 7-9, 100, 105-106, 109, 111, 115, 126-128, 138-

140, 143, in direct contravention of 42 U.S.C. § 9607(f).  As the Tenth Circuit held in *New

*Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1244-48 (10th Cir. 2006), however, "CERCLA's comprehensive [natural resource damages] scheme preempts any state remedy designed to achieve something other than the restoration, replacement, or acquisition of the equivalent of a contaminated natural resource," including, most notably "an unrestricted award of money damages."  *See New Mexico*, 467 F.3d at 1244, 1247-48. Thus, the State's Complaint initiating this action is in conflict with the comprehensive, detailed statutory scheme that Congress created in CERCLA for the purpose of restoring or replacing contaminated natural resources.

81.    Defendants also assert the federal defense that Plaintiff's claims are barred by principles of conflict preemption. Specifically, Plaintiff claims that Oregon State laws imposed a contemporaneous duty on Old Monsanto not to manufacture PCBs, but that conflicts with federal directives requiring the manufacture of PCBs under the Defense Production Act, federal government orders and purchases, and statutes permitting the continued use of PCBs, *e.g.*, 15 U.S.C. § 2605(e)(2)(A).

82.    A state "requirement" may take the form of a common law suit for damages. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 521 (1992). The asserted requirements of Oregon state law rely on the imposition of a duty on Old Monsanto to have stopped producing and using PCBs, which stands as an obstacle to the accomplishment of federal objectives; thus, the Plaintiff's claims are barred by principles of conflict preemption. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (federal law is supreme and overrides state law where state law stands as an obstacle to the accomplishment of objectives of Congress).

**B.      PLAINTIFF ALLEGES THAT PCBs IMPACTED WATER BODIES ON**

**OR ADJACENT TO FEDERAL ENCLAVES SUBJECT TO EXCLUSIVE**

**FEDERAL JURISDICTION**

83.      The Complaint alleges that numerous water bodies throughout the State of

Oregon have been impacted by PCBs manufactured by Old Monsanto. *See* Compl. ¶ 90, 102,

104 and 105. PCBs manufactured by Old Monsanto were allegedly released on several federal

enclaves within the State of Oregon (the jurisdiction over which the State of Oregon has, by

statute, expressly ceded to the federal government) and some portion of the water bodies Plaintiff

alleges are impacted by PCBs are located on or adjacent to these federal enclaves. As a result,

this Court has jurisdiction under 28 U.S.C. § 1331 and article I, section 8, clause 17 of the U.S.

Constitution because actions that arise on federal enclaves, as here, necessarily present questions

of federal law.[41]

84.      A federal enclave results when a state transfers its territory to the United States

through cession or consent, thus granting the federal government exclusive jurisdiction. To be

considered a federal enclave, the federal government must have purchased a territory "by the

Consent of the Legislature of the State." *See* U.S. Const. art. I, § 8, cl. 17 ("Congress shall have

Power . . . to exercise exclusive Legislation in all Cases whatsoever, over such District . . . as

may, by Cession of Particular States . . . become the Seat of the Government of the United

States, and to exercise like Authority over all Places purchased by the Consent of the Legislature

of the State in which the Same shall be . . ."). In the State of Oregon, Oregon Revised Statutes

---

[41] Plaintiff attempts to carve-out this Court's jurisdiction on this ground, by asserting that it does
not make any claim with respect to federal enclaves. Compl. ¶ 26. This brazen attempt to avoid
federal jurisdiction must fail—Plaintiff cannot claim, one the one hand, that PCBs are ubiquitous
and on the other that it only makes claims for some PCBs but not others. This issue is discussed
more fully at paragraphs 103 to 110 *infra*.

("ORS") 272.030 provides that "[c]onsent is given to the United States to acquire lands for the purpose of erecting thereon any needful public buildings, under authority of any Act of Congress. The United States may enter upon and occupy such lands which may be purchased or otherwise acquired, and shall have the right of exclusive jurisdiction over the lands, subject to ORS 272.015."

85.    "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006). That is so because "[o]nly federal law applies on a federal enclave," *Cooper v. S. California Edison Co.*, 170 F. App'x 496, 497 (9th Cir. 2006) (per curiam), and therefore any tort claim must necessarily be founded in federal law. *See Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law . . . ."). This is true even where state law claims were recognized prior to the creation of a federal enclave. *Cooper*, 170 F. App'x at 497 ("preexisting state law not inconsistent with federal policy becomes federal law"); *Macomber v. Bose*, 401 F.2d 545, 546 (9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."). Accordingly, claims that purport to be based in state law may be removed to federal court if they arise on a federal enclave. *See*, *e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012) (noting that the claims in a case removed under the federal enclave doctrine "were all based on state law theories").

86.     Even if Plaintiff was able to prove that PCB-related impacts occurred at different levels in areas within federal enclaves and those outside it (which, Defendants contend, is not possible and would be mere speculation and guesswork), the fact that there may be differing levels of PCBs is irrelevant. Even if PCB-related conditions were more pronounced outside federal enclaves than within them, this Court would still have jurisdiction over the conditions within federal enclaves, and would then have supplemental jurisdiction over any contamination arising outside of federal enclaves. 28 U.S.C. § 1367.

87.     Pursuant to ORS 272.036, the Oregon legislature has expressly ceded exclusive jurisdiction over the navigational locks at Oregon City Canal to the federal government. Referred to as the Willamette Falls Navigation Canal and Locks, they have been owned and operated by the U.S. Army since 1915, and were moved to a non-operational status in 2011.[42] A Disposition Study has commenced "in order to determine whether sufficient federal interest exists to retain the project for its authorized purpose and, if not, to determine whether the project should be de-authorized, and if the associated real property and Government-owned improvements should undergo disposal." Ex. 46 at p. 1. At this time, however, the area remains a federal jurisdiction.

88.     The Locks are located at approximately river mile 26.2 on the Willamette River, near its confluence with the Columbia River. *See* Ex. 46 at p. 1. Plaintiff claims that "[t]he *Willamette River, between RM 0 and 72*, contains elevated levels of PCBs. PCB concentrations *throughout the reach* exceed guideline values. Levels of PCBs in excess of health criteria have been measured in various species of fish." Compl. ¶ 99(j) (emphasis added). Thus, this federal

---

[42] *See* US Army Corps of Engineers, Portland District, Willamette Falls Locks, Willamette River, Oregon, Section 216 Preliminary Draft Disposition Study with Integrated Environmental Assessment (**Exhibit 46**) at pp. 1-2.

enclave is located squarely within an area of alleged contamination cited in Plaintiff's Complaint.

89.    Umatilla Army Depot is an area of approximately 20,000 acres straddling the Umatilla and Morrow county line in eastern Oregon, and the federal government has exclusive jurisdiction over 8,444 acres of the Depot.[43] It is located in the Umatilla watershed area[44]—an area specifically identified by Plaintiff as an area in which Old Monsanto's PCBs have allegedly been detected, and in relation to which it seeks relief. *See* Compl. ¶ 105.

90.    The legislature has also ceded exclusive jurisdiction over Crater Lake National Park to the federal government pursuant to ORS 272.070. It is the only National Park in Oregon, comprising approximately 185,000 acres in Klamath County. It falls within the Upper Klamath Lake watershed area[45], which Plaintiff alleges contains fish in which Old Monsanto's PCBs have been detected. *See* Compl. ¶105.

91.    Because Plaintiff's allegations reveal that its claims arose in part on these federal enclaves, those claims raise federal questions that create jurisdiction under 28 U.S.C. § 1331 and permit removal under 28 U.S.C. § 1441. *See Durham*, 445 F.3d at 1250 (noting that removal is proper where "[t]he complaint reveal[s] that some of [the plaintiff's] claims arose on federal enclaves").

---

[43] Seattle District, Real Estate Division, Army Corps of Engineers, Title Report Umatilla Chemical Depot, Morrow and Umatilla Counties, Oregon (August 15, 2008) (**Exhibit 47**) at p. 8.

[44] Kennedy-Breit Decl. Exhibit C.

[45] *Id*.

C.    **PLAINTIFF PLEADS A FEDERAL CERCLA NATURAL RESOURCES DAMAGES CLAIM UNDER 42 U.S.C. § 9607(A)(4)(C)**

92.    Plaintiff's Complaint raises a federal question under 28 U.S.C. § 1331 because it alleges "The presence of Monsanto's PCBs …has had significant adverse impacts on the availability of Oregon's natural resources….and their presence will continue to have such adverse impacts" (Compl. ¶8), and it seeks "damages from Monsanto for the cost…to remediate the widespread damage caused by the presence of Monsanto's PCBs on Oregon's lands, in Oregon's waters, and throughout Oregon's natural environment." Compl. ¶ 9. For the reasons outlined *infra*, this is, on its face a claim that arises under the CERCLA, notwithstanding Plaintiff's attempt to disguise this by omitting any mention of the statute. With limited exceptions, "the United States district courts shall have exclusive original jurisdiction over all controversies arising under [CERCLA], without regard to the citizenship of the parties or the amount in controversy." 42 U.S.C. § 9613(b). As such, the court has federal question jurisdiction.

93.    Plaintiff's Complaint alleges damages to the natural resources located within the State numerous times, and broadly contends the State is the designated "trustee" here for purposes of recovering all natural resource damages. *See* Compl. ¶¶ 3, 5, 7, 8, 9, 10, 21, 23, 25, 86–106, 108–111, 117–121, 123, 124, 126, 130–133, 138–140. Given that the Complaint encompasses "all natural resources within its borders," Compl. ¶ 9, the scope of Plaintiff's claims necessarily encompass the substantial natural resources located within the State, but subject to the jurisdiction of the federal government.

94.    None of the five enumerated state law claims for public nuisance, purpresture, trespass, equitable indemnity or unjust enrichment recognizes or authorizes "natural resource

damages," which provides further evidence that Plaintiff's allegations are actually thinly veiled CERCLA claims.

95.     Only CERCLA provides the legal foundation for the alleged natural resource damages cause of action and remedy repeatedly raised in the Complaint. Specifically, CERCLA is the federal regulatory scheme under which a plaintiff may pursue from appropriate parties "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss." 42 U.S.C. § 9607(a)(4)(C). Indeed, CERCLA expressly provides for a claim that is made against appropriate parties by a "State act[ing] on behalf of the public as trustee of such natural resources [i.e., "natural resources within the State] to recover such damages." 42 U.S.C. § 9607(f)(1). That is what Plaintiff, the State of Oregon, is doing here—indeed, it is the focal point of the lawsuit. *See* Compl. ¶ 9 ("The State brings this action in its sovereign capacity as trustee for all natural resources within its borders, which it holds and protects for the benefit of all Oregonians… Through this action, the State seeks to recover damages from Monsanto for the costs that the State has incurred, and will continue to incur, to remediate the widespread damage caused by the presence of Monsanto's PCBs on Oregon's lands, in Oregon's waters, and throughout Oregon's natural environment").

96.     By repeatedly alleging and seeking recovery for damages to natural resources, the Complaint arises under CERCLA and is subject to exclusive federal jurisdiction. 42 U.S.C. § 9613(b). Despite Plaintiff's artful avoidance of the acronym "CERCLA" in any cause of action,[46] the Complaint can only be read as invoking CERCLA on its face. CERCLA provides

---

[46] The Complaint does refer to CERCLA only with respect to Portland Harbor. It states that the EPA, pursuant to its authority under CERCLA, identified Portland Harbor as a "Superfund Site," placed it on the National Priorities List, and that the Plaintiff faces significant potential liability for the cleanup cost of this area. *See* Compl. ¶¶ 91, 96–98.

the basis for the natural resource damages recovery that the Complaint makes clear is the focal point of the lawsuit; none of the myriad state theories pleaded in the Complaint even permit that form of relief. By contrast, Section 107(f)(1) of CERCLA expressly provides for the State to sue "on behalf of the public as trustee" for the "natural resources within the State" to "recover for . . . damages" to "such natural resources."

97.    The presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction ordinarily exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. But the "absence of a federal claim on the face of [the] complaint does not end our jurisdictional inquiry." *Hall v. N. Am. Van Lines, Inc*, 476 F.3d 683, 687 (9th Cir. 2007). This is because "the artful pleading doctrine creates an exception to this general rule. Artful pleading exists where a plaintiff articulates an inherently federal claim in state-law terms." *Brennan v. Sw. Airlines Co.*, 134 F.3d 1405, 1409 (9th Cir. 1998), amended sub nom. *Brennan v. Sw. Airlines*, 140 F.3d 849 (9th Cir. 1998). Application of the artful pleading doctrine is appropriate here because Plaintiff attempts to characterize a CERCLA claim for natural resource damages as a state law public nuisance, purpresture, and trespass case, even though none of those state-law causes of action in the Complaint supports Plaintiff's theory of standing, damages, or recovery. Thus, despite not expressly pleading a CERCLA claim on the face of the Complaint, the State has artfully pled an inherently federal claim in state law terms, such that the case arises under federal law. *Id.*

98.    Moreover, even apart from the artful pleading rule, a federal question appears on the face of the Complaint here for a separate reason. The test for whether a case "arises under" federal law for purposes of 28 U.S.C. § 1331 has been "well established" for many decades. *Gully v. First Nat. Bank*, 299 U.S. 109, 112 (1936). "To bring a case within the statute, a right or

immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." *Id.* (citing *Starin v. New York*, 115 U.S. 248, 257 (1885); *First National Bank v. Williams*, 252 U.S. 504, 512 (1920)).  Under the well-pleaded complaint rule, that the plaintiff purports formally to predicate its claims on state law grounds is not the end of the matter. "The [federal question] doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues . . . ." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).

99.     Under CERCLA, the "term 'damages' means damages for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of this title." 42 U.S.C. § 9601(6). 42 U.S.C. § 9611(b) then instructs that "the term 'natural resource claim' means any claim for injury to, or destruction or loss of, natural resources." 42 U.S.C. § 9611(b)(2)(B). The Ninth Circuit interprets the word "any" in statutory language broadly. *See Brennan*, 134 F.3d at 1409–10 (affirming denial of remand where Complaint stated state-law causes of action only but raised a federal question based on federal statute governing tax refund suits for "any sum" wrongfully collected in "any manner").

100.    Plaintiff expressly seeks natural resource damages as trustee of the State's natural resources throughout the Complaint, and none of the enumerated state-law claims recognizes or authorizes such damages—therefore, a "natural resource claim" under CERCLA is an element (and a substantial, essential one) of Plaintiff's causes of action. *See* paragraph *93 supra*; 42 U.S.C. § 9607(a)(4)(C); 42 U.S.C. § 9607(f)(1); *Gully*, 299 U.S. at 112.

101.    Federal jurisdiction is particularly appropriate where, as here, sites allegedly impacted by PCBs are already subject to ongoing CERCLA cleanup actions. *See*, *e.g.*, U.S. EPA, "Portland Harbor," https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=1002155 (last visited Jan. 24, 2018) (stating that this Superfund site "is the result of decades of industrial use along the Willamette River") and U.S. EPA, "NW Northwest Pipe & Casing/Hall Process Company," https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=1000527 (last visited Jan. 24, 2018) (stating that "[t]he company manufactured and coated pipes at the site from 1956 to 1985. Improper waste disposal contaminated the soil and groundwater with solvents, primers, coal tar, coal-tar residues, polychlorinated biphenyls (PCBs), and oils."). *See also* Compl. ¶¶ 90 to 98 (identifying Portland Harbor as a contaminated body and specifically referring to the CERCLA cleanup action), and Compl. ¶ 102(b) (identifying NW Northwest Pipe & Casing/Hall Process Company as Orphan Site No. 139, one of a number of CERCLA Orphan Sites that is an allegedly contaminated body).

102.    Because the Complaint seeks natural resources damages that are an essential element of CERCLA, it raises a federal question under CERCLA and is thus subject to exclusive federal jurisdiction.

### D.    PLAINTIFF CANNOT AVOID REMOVAL BY ATTEMPTING TO CARVE OUT FEDERAL JURISDICTION

103.    In this case, Plaintiff attempts to avoid the jurisdiction of this Court by asserting that only the Circuit Court of the State of Oregon has subject matter jurisdiction over its claims. Compl. ¶ 26. Plaintiff goes further in its blatant attempt to avoid the jurisdiction of the federal courts by disavowing any relief or damages caused by any acts or omissions that may invoke this Court's federal officer removal jurisdiction, as well as any potential jurisdiction based on

damages to any federal enclave and abjuring "any form of relief that arises under federal law or otherwise serves as a basis for federal jurisdiction." *See id.* This stated attempt to self-define jurisdiction must fail.

104.    *First*, the federal officer removal statute is an exception to the well-pleaded complaint rule. Generally, plaintiffs are free to craft claims as they see fit, and may allege only state-law claims to purposefully avoid removal to federal courts, as "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). This rule makes the plaintiff the master of their complaint, with the ability to avoid federal jurisdiction by exclusive reliance on state law. *Id*. As a corollary to this rule, defendants cannot remove a well-pleaded, state-law complaint simply by raising a federal defense—even when the complaint anticipates that defense, and even if both parties admit that the federal defense is the only question truly at issue. *See Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998) (quoting *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 14 (1983)).

105.    However, this Court has recognized that "[c]ases removed under the federal officer removal statute…are not subject to the well-pleaded complaint rule and its corollary principles." *Coury v. Air & Liquid Sys. Corp.*, No. 3:16-CV-01796-SB, 2017 WL 2345688, at *2 (citing *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006)). Due to the exceptional nature of suits against federal officers, when removing under the federal officer removal statute, a case "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

106.    Therefore, Plaintiff's attempt to avoid federal jurisdiction must fail. It is irrelevant that the Complaint is cast in a non-federal manner in an attempt to avoid 28 U.S.C. § 1442. As outlined *supra* at paragraphs 40 to 82, Defendants are clearly able to make out a colorable defense based on federal law, and have satisfied the other requirements of 28 U.S.C. § 1442.

107.    *Second*, it is not possible for Plaintiff to avoid federal jurisdiction over federal enclaves simply by representing that they have no intent to pursue damages for such areas. As noted *supra* in paragraph 83, a number of the allegedly contaminated sites are "on or near" federal territories. In addition, Plaintiff claims that PCBs enter the food chain as predators eat contaminated prey, resulting in bioaccumulation (Compl. ¶46) and further asserts that "PCBs are transported through soil, sediment, air, and water. Because they attach so readily to particulate matter, they often are transported to remote areas far from the location of initial release." Compl. ¶49.

108.    Plaintiff cannot claim, on the one hand, that PCB molecules are easily spread far from their source such that PCBs are ubiquitous, and on the other claim relief only for specific areas located in Oregon but not others. Such a claim is akin to seeking recovery for a contaminated swimming pool, but only as to any alleged contamination that entered from the left side of the pool, not the right. Distinctions such as these cannot be meaningfully drawn in this case.

109.    *Third*, as noted *supra* in paragraph 97, the artful-pleading rule applies to allow the finding of federal question jurisdiction even where a claim is expressed in state law terms.

110.    As such, Plaintiff's attempt to avoid federal jurisdiction must fail.

# IV.    CONCLUSION

111.    Old Monsanto was acting under the color of federal officers and agencies in conducting the activities for which the State of Oregon seeks to hold its alleged successors liable. Defendants remove this case under 28 U.S.C. § 1442 and assert colorable federal defenses, which they are entitled to present in a federal forum. In addition, the Complaint alleges PCB-related impacts on, underneath, adjacent to, or immediately downgradient from established federal enclaves in the State of Oregon, and seeks natural resource damages under CERCLA, both of which raise federal questions, provide the Court jurisdiction under 28 U.S.C. § 1331, and permit removal under 28 U.S.C. § 1441.

112.    Defendants reserve the right to amend or supplement this notice of removal.


Respectfully,

DATED: February 5, 2018                SCHWABE, WILLIAMSON & WYATT, P.C.

By ____/s/ Richard K. Hansen_____
Richard K. Hansen, OSB #832231
Email: rhansen@schwabe.com
Nathan D. Sramek, OSB #140173
Email: nsramek@schwabe.com
SCHWABE WILLIAMSON & WYATT
Phone: (503) 222-9981

*Attorneys for Defendants Monsanto Company,*
*Solutia Inc., and Pharmacia LLC*