**ELLEN F. ROSENBLUM**
Attorney General
**Henry Kantor,** OSB No. 792843
Special Counsel to the Attorney General
Email: henry.kantor@doj.state.or.us
**Scott Kaplan,** OSB No. 913350
Senior Assistant Attorney General
Email: scott.kaplan@doj.state.or.us
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880

-and-

**Keith Ketterling,** OSB No. 913368
Email: kketterling@stollberne.com
**Yoona Park,** OSB No. 077095
Email: ypark@stollberne.com
**Nadia H. Dahab,** OSB No. 125630
Email: ndahab@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600

*Special Assistant Attorneys General for the State of Oregon*

[Additional Counsel listed on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON by and through Ellen F. Rosenblum, Attorney General for the STATE OF OREGON,<br><br>    Plaintiff,<br><br>  v.<br><br>MONSANTO COMPANY; SOLUTIA, INC.; PHARMACIA LLC; and DOES 1 - 10,<br><br>    Defendants. | Case No. 3:18-cv-00238-MO<br><br>**FIRST AMENDED COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff State of Oregon ("the State"), by and through its Attorney General, Ellen F. Rosenblum, files this Complaint against Defendants Monsanto Company, Solutia, Inc., Pharmacia LLC, and Does 1 to 10, inclusive (collectively, "Defendants" or "Monsanto"), and alleges as follows:

## INTRODUCTION

1.

The State of Oregon brings this action to protect the health, safety, and welfare of its people and its natural environment.

2.

Oregon is a special place, home to a rich natural landscape and an abundance of natural resources. Forests blanket nearly half of the state, providing critical habitat to wildlife such as the bald eagle, black bear, elk, wolf, and beaver. A total of 110,994 miles of river flow within the State's borders, almost 2,000 of which are designated as Wild & Scenic under the National Wild & Scenic Rivers System. Oregon's rivers and streams are home to a wide diversity of fish, including salmon, steelhead, trout, sturgeon, and dozens of other native species. Along Oregon's coast are vibrant marine waters and estuaries that teem with life; seals, otters, and whales use these waters alongside sharks, halibut, and tuna. Dungeness crab, oysters, and other shellfish thrive on the seafloor. These ecosystems are vital to the history, identity, and sustainability of the State, including its tribal communities, and they serve critical roles in the State's economy. Many Oregon jobs depend on fishing, sustainable timber production, and the production of wholesome agriculture products. Oregonians, from the high desert to the ocean shores, have a right to use and enjoy these resources for commerce, sustenance, recreation, tourism, aesthetic enjoyment, and quiet solitude. Oregon would not be Oregon without this remarkable natural environment.

Page 1 -     **FIRST AMENDED COMPLAINT**

3.

Unfortunately, many of Oregon's natural resources and environments are contaminated with polychlorinated biphenyls, highly toxic chemicals known more commonly as "PCBs." PCBs do not occur naturally, yet today they persist throughout Oregon's waterways, upland areas, soils, sediments, aquatic life, marine mammals, and birds. PCBs cause a wide range of systemic toxic effects in humans and animals and can seriously impair the endocrine, neurologic, and reproductive systems. PCBs have caused harm to eagles, osprey, and other birds, as well as various fish species across Oregon.

4.

This PCB contamination throughout Oregon is a result of the actions of one company: Monsanto. Between 1929 and 1977, Monsanto was the only company in the United States to manufacture PCBs for widespread commercial use. Monsanto distributed PCBs widely, including throughout Oregon, for use in a broad array of products ranging from electrical equipment to lighting ballasts, from paint to caulking.

5.

Despite knowing as early as 1937 that PCBs were toxic to humans and animals and that PCBs could escape into and contaminate the environment, Monsanto manufactured and sold PCBs until they were finally banned under federal law.[1] Even when Monsanto had overwhelming evidence of the hazards that PCBs create, Monsanto continued to flood the country with these toxic materials. Monsanto's own internal documents show that it was not interested in protecting people or the environment; rather, its only concern was in protecting its balance sheet.

---

[1]    Toxic Substances Control Act, 15 U.S.C. § 2605(e)(3)(A) (eff. Jan. 1, 1977) ("[N]o person may manufacture any polychlorinated biphenyl after two years after the effective date of this Act.").

Page 2 -    **FIRST AMENDED COMPLAINT**

6.

As public concerns about PCBs began to grow in the 1960s, Monsanto did not alert its customers or the public of its knowledge of the dangers of PCBs.  Instead, Monsanto assembled an internal team and tasked it with deflecting criticism of both PCBs and the company itself. The team was told that Monsanto "can't afford to lose one dollar of business" from its PCB sales.  Despite knowing that millions of pounds of highly toxic PCBs were being released into the environment every year, Monsanto worked to hide the dangerous and persistent effects of the hazardous chemicals because "selfishly too much Monsanto profit" would be lost if the company told the truth.  Monsanto concealed from consumers, the State of Oregon, the U.S. Government, and the public its knowledge of the remarkably harmful effects of PCBs and Monsanto's role in introducing these toxins to the surrounding environment, deciding instead that its financial bottom line—and, later, its corporate reputation—were more important than the health and well-being of humans and the environment.

7.

Today, Oregon bears the burden of Monsanto's decision to place profit above all else. The toxic legacy that Monsanto left Oregonians lives on, as PCBs persist in Oregon's lands, rivers, and waterways, in its sediments, soils, and in the bodies of animals and humans.  It has caused harm to aquatic, marine, and avian species, and poses ongoing risks to the health of the people of the State of Oregon.

8.

The State has incurred significant cleanup costs associated with the investigation and remediation of sites contaminated with PCBs, and it will continue to incur such costs long into the future.  The presence of Monsanto's PCBs in Oregon's waterways and sediments, on Oregon's land, and throughout Oregon's natural environment has had significant adverse impacts on the availability of Oregon's natural resources for recreational, commercial, cultural, and

Page 3 -     **FIRST AMENDED COMPLAINT**

aesthetic uses, and their presence will continue to have such adverse impacts as long as they persist in Oregon's natural environment.

9.

The State brings this action in its sovereign capacity as trustee for all natural resources within its borders, which it holds and protects for the benefit of all Oregonians. Those natural resources include the beds and banks of every river within the State; all waters within the State from all sources of water supply;[2] and all fish, wildlife, and fish and wildlife habitat areas throughout the State. The State also brings this action in its capacity as owner of certain lands within its borders that have been contaminated by PCBs and for reimbursement of the costs it has incurred, and likely will incur in the future, to investigate and clean up PCB contamination throughout the State. Through this action, the State seeks to recover damages from Monsanto for the costs that the State has incurred, and will continue to incur, to remediate the widespread damage caused by the presence of Monsanto's PCBs on Oregon's lands, in Oregon's waters, and throughout Oregon's natural environment.

## PARTIES

10.

The State holds in trust for the public the bed and banks, and waters between the bed and banks, of all waterways within the State. By virtue of its public trust responsibilities, all such lands are to be preserved for public use in navigation, fishing, and recreation. The State is also the trustee of all natural resources—including land, water, wildlife, and habitat areas—within its borders. As trustee, the State holds these natural resources in trust for all Oregonians—preserving, protecting, and making them available to all Oregonians to use and enjoy for recreational, commercial, cultural, and aesthetic purposes.

---

[2]    ORS 537.110 ("All water within the state from all sources of water supply belongs to the public."); *Schnitzer Inv. Corp. v. Certain Underwriters at Lloyd's of London*, 341 Or 128, 132, 137 P3d 1282 (2006) (recognizing state ownership of water).

Page 4 -    **FIRST AMENDED COMPLAINT**

11.

The State brings this action by and through its Attorney General, Ellen F. Rosenblum, who is authorized under Oregon law, including pursuant to ORS 180.060(1)(d), to bring the claims asserted herein on her own behalf, on behalf of the affected State agencies and entities, and for the benefit of the people of Oregon.

12.

Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

13.

Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Solutia, Inc. is a wholly owned subsidiary of Eastman Chemical Company.

14.

Defendant Pharmacia LLC ("Pharmacia"), formerly known as "Pharmacia Corporation" and successor to the Monsanto Chemicals Company, is a Delaware limited liability company with its principal place of business in Peapack, New Jersey. Pharmacia LLC is a wholly owned subsidiary of Pfizer, Inc.

15.

During the period between 1929 and 1977, the original Monsanto Company ("Original Monsanto") owned and operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. As part of its chemical products business, Original Monsanto began manufacturing PCBs in the 1930s. It continued manufacturing PCBs until 1977, shortly before the manufacture and sale of PCBs in the United States was prohibited by federal law.

Page 5 -     **FIRST AMENDED COMPLAINT**

16.

Beginning in approximately 1977, Original Monsanto underwent a series of corporate transactions that caused its businesses to spin off into three separate entities. The corporation now known as Monsanto operates Original Monsanto's agricultural products business.

17.

Defendant Solutia now operates Original Monsanto's chemical products business. Solutia was organized for the purpose of owning and operating the chemical products business, and therefore has assumed all operations, assets, and liabilities of that business.

18.

Defendant Pharmacia now operates Original Monsanto's pharmaceutical business.

19.

All Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more other entities, for claims arising from Original Monsanto's chemical products business, including claims arising from Original Monsanto's manufacture and sale of PCBs. Monsanto, Solutia, and Pharmacia are otherwise jointly and severally liable to third parties such as Oregon for the liabilities resulting from the acts and omissions of Original Monsanto as a matter of law.

20.

Throughout this Complaint, and for the purposes of this litigation, Monsanto, Solutia, and Pharmacia collectively will be referred to as "Defendants" or "Monsanto."

## JURISDICTION AND VENUE

21.

This Court has personal jurisdiction over the parties in this action pursuant to Oregon Rules of Civil Procedure 4C, 4D, and 4F. The claims arise out of acts and omissions attributable to Defendants that occurred in and outside Oregon. The properties that are the subject of the State's claims for relief are located in Oregon. The State's claims for relief arise out of its

Page 6 -    **FIRST AMENDED COMPLAINT**

ownership, use, or possession of those properties. The State's claims for relief also arise out of its role as trustee of public trust resources, including fish and wildlife.

22.

Venue is proper in this Court pursuant to ORS 14.040. Some of the properties that are the subject of the State's claims are situated in Multnomah County.

23.

The State has standing to bring this action as an owner and trustee of land and water and as trustee of certain natural resources described above and throughout this Complaint.

24.

The State also brings this action in its *parens patriae* capacity and thereby acts on behalf of all Oregonians affected by the presence of PCBs in Oregon's environment. The State has a quasi-sovereign interest in the well-being, health, and comfort of all Oregonians who have been injured and continue to be threatened by the persistence of Monsanto's PCBs throughout the State's lands and natural environment. Such injuries include harm to Oregon businesses, increased risk of harm to human health, increased risk of harm to the vitality of Oregon's fish and wildlife species, and decreased availability of Oregon's natural resources for commercial, recreational, tourist, cultural, and aesthetic purposes.

25.

The State also has a proprietary interest in the land and resources it owns, controls, or holds in trust. The persistence of Monsanto's PCBs in and on lands owned, controlled, or held in trust by the State has caused injury to, and has threatened, the State's proprietary interests. The State has suffered injuries to those interests including, but not limited to, monetary damages that it has incurred as trustee of land in the Portland Harbor, costs that it has incurred remediating buildings and other property contaminated with PCBs, and diminished property value of its buildings and land as a result of PCB contamination. In addition, the State has incurred cleanup and remediation costs at other properties in the State. The State anticipates that it will incur

Page 7 -    **FIRST AMENDED COMPLAINT**

significant additional costs to clean up and remediate additional lands that it owns, controls, or holds in trust that are contaminated by Monsanto's PCBs.

26.

Only this Court has subject matter jurisdiction over Plaintiff's claims.  To the extent that Defendants allegedly acted or failed to act at the direction of the United States or any agency thereof, or any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office, Plaintiff does not seek relief for damages caused by such actions or failures to act.  To the extent that Defendants allegedly acted or failed to act pursuant to any federal regulation or specification, Plaintiff likewise does not seek relief for any damages caused by such actions or failures to act.  Plaintiff does not seek relief for damages caused by actions or failures to act in connection with any government contract deemed necessary for the national defense, and Plaintiff does not seek relief for damages to any federal enclave.  Plaintiff does not, by this Complaint, pursue any form of relief that arises under federal law or otherwise serves as a basis for federal jurisdiction.

## **GENERAL ALLEGATIONS**

**A.     PCBs Are Toxic Chemicals That Persist in the Natural Environment.**

27.

Polychlorinated biphenyls ("PCBs") are a group of human-made organic compounds formed by the addition of between 1 and 10 chlorine atoms to the aromatic hydrocarbon "biphenyl."  In each molecule of PCB, the number and location of chlorine atoms determines the compound's physical and chemical properties.  Currently, 209 unique chemical configurations of PCBs have been identified; these configurations are known as "congeners."

Page 8 -    **FIRST AMENDED COMPLAINT**

28.

Based on their chemical composition, PCBs fall within the family of chemical compounds known generally as "chlorinated hydrocarbons." Other chlorinated hydrocarbons include dioxins (for example, Agent Orange), DDT, Chlordane, Aldrin, and similar pesticides.

29.

PCBs are not naturally occurring substances. There are no known natural sources of PCBs in the environment.

30.

The physical properties of each PCB congener vary depending on the congener's degree of chlorination. Most congeners are colorless or slightly yellow, odorless, crystalline compounds.[3] Others, however, may be liquid mixtures with varying degrees of viscosity.[4] Commercially, PCBs generally were manufactured and produced as complex mixtures of PCB congeners, not as single PCB compounds.[5]

31.

Commercial manufacture and production of PCBs began in the late 1920s. Since the onset of their commercial production in the United States by Original Monsanto, PCBs were used extensively for industrial and commercial purposes, as well as in consumer products.[6] PCBs are fire resistant because of their high flash points, minimally water soluble, chemically stable, and possess excellent dielectric properties. Because PCBs are chemically inert, they do not easily degrade; neither do they react to acids, alkalis, or oxidants. The half-life associated

---

[3]    International Agency for Research on Cancer (IARC), *Polychlorinated Biphenyls and Polybrominated Biphenyls, in* IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 107, 51 (2016) (hereinafter *IARC Monograph*).

[4]    *Id.*

[5]    *Id.* at 53.

[6]    *Id.* at 71.

Page 9 -   **FIRST AMENDED COMPLAINT**

with PCBs can be decades-long;[7] thus, they will persist in the natural environment for centuries if they are not remediated.

32.

PCBs are also lipophilic, which causes them to accumulate in lipid-rich tissues and substances, such as the fatty tissues of wildlife, birds, fish, and other animal life.[8]

33.

PCBs are highly toxic chemicals that adversely impact human health and the environment.  For humans, PCB exposure can cause serious liver damage, depressed immune system function, skin conditions such as acne and rashes, significant irritation of and harm to the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, depression, fatigue, and learning capacity impairment.[9]  The Environmental Protection Agency ("EPA") has also concluded that PCBs are probable human carcinogens.  Children are particularly susceptible to harm by PCB exposure, and they can be exposed to PCBs both prenatally and through breast milk.  Because of their physiology and behavior, children may also be particularly vulnerable to altered development due to PCBs.[10]

---

[7]     Agency for Toxic Substances & Disease Registry ("ATSDR"), U.S. Dep't of Health & Human Servs., *Toxicology Profile for Polychlorinated Biphenyls* 326–28 (Nov. 2000) (hereinafter *ATSDR Toxicology Profile*).

[8]     *IARC Monograph* at 431.

[9]     *See generally ATSDR Toxicology Profile* at 90–283.

[10]     *Id.* at 381 ("Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat depots for sequestering the lipophilic PCBs."); *id.* at 7 ("Children . . . may accidentally eat some PCBs through hand-to-mouth behavior, such as by putting dirty hands or other soil/dirt covered objects in their mouths, or eating without washing their hands.  Some children also eat dirt on purpose; this behavior is called pica.  Children could also be exposed by playing with old appliances or electrical devices that contain PCBs.")

Page 10 -   **FIRST AMENDED COMPLAINT**

34.

In 1996, EPA reassessed PCB carcinogenicity based on data related to Aroclors 1016, 1242, 1254, and 1260.[11]  EPA's reassessment was peer-reviewed by 15 experts, all of whom agreed that PCBs are probable human carcinogens.  EPA also confirmed in its reassessment what scientists had established years earlier—that PCBs are associated with serious non-cancer health effects, including harm to the human and animal immune, reproductive, nervous, and endocrine systems. [12]

35.

PCBs are toxic to a number of species, including fish, mammals, pinnipeds (*e.g.*, seals and sea lions), and birds.  Because PCB transport patterns show a gradual redistribution toward the marine environment, fish-eating marine mammals are potentially the most sensitive wildlife receptors to PCB exposure.  Studies show that PCB accumulation impairs fish and wildlife reproduction because of increased embryotoxicity and decreased egg viability and hatchability, due, in part, to thinning egg shell thickness.  PCBs also can cause neurological impairment in wildlife, including disruptions to the nervous system and changes in behavior, as well as endocrine-related impairments and dermal/ocular effects.  Moreover, studies of minks and certain bird species have shown that PCB contamination correlates to population decline and reproductive impairment, particularly in fish-eating species.[13]

---

[11]    "Aroclor" is the trade name associated with PCBs manufactured and distributed by Monsanto.  As described in further paragraphs of this Complaint, Monsanto assigned each Aroclor congener mixture a numerical identifier (*e.g.*, 1016, 1242, 1254, or 1260), which generally was assigned based on the mixture's chlorine content.

[12]    *See* Environmental Protection Agency, *PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures* (Sept. 1996).

[13]    *See, e.g.*, *ATSDR Toxicology Profile* at 285–95.

Page 11 -   **FIRST AMENDED COMPLAINT**

**B.    Monsanto Caused Hundreds of Millions of Pounds of PCBs to Enter and Contaminate the Natural Environment.**

36.

Commercial production of PCBs in the United States began in 1929 by Swann Research, Inc., in Anniston, Alabama, the corporate predecessor to Original Monsanto.  Swann Research manufactured and distributed PCBs under the trade name "Aroclor," which Original Monsanto later trademarked.

37.

PCB manufacturers in other countries used different trade names for PCBs that they produced.

38.

Monsanto assigned each Aroclor congener mixture a unique number (*e.g.*, Aroclor 1221, Aroclor 1232, Aroclor 1242), the last two digits of which generally referred to the amount of chlorine in the mixture.

39.

Original Monsanto purchased Swann Research in 1935, in part because of the high profits that Swann Research was generating through the manufacture, sale, and distribution of PCBs and PCB-containing materials.

40.

Original Monsanto—and its corporate predecessor Swann Research—was the only manufacturer in the United States that intentionally produced and distributed PCBs for widespread commercial use between 1930 and 1979.

41.

Original Monsanto distributed PCBs to its customers on a widespread basis.  Its annual production peaked in 1970, when Monsanto produced a total volume of 39,000 metric tons of PCBs.  Between 1957 and 1971, Monsanto produced 12 different types of Aroclor, each with a different chlorine content ranging from 21 to 68 percent.  Between 1930 and 1977, Monsanto

Page 12 -    **FIRST AMENDED COMPLAINT**

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

produced a total of 641,246 metric tons of PCBs in the United States.  Monsanto produced PCBs at two plant locations: Anniston, Alabama, and Sauget, Illinois.

42.

Monsanto developed, produced, and marketed PCBs for use in a wide range of commercial and industrial applications.  PCBs were advertised and predominantly used as components of dielectric fluids—materials used for electrical insulation—in capacitors, transformers, and other electrical systems.  Indeed, during the 1960s, dielectric fluid in capacitors and transformers accounted for 50 to 60 percent of the sales of PCBs in the United States.  Other uses included, to name only a few, hydraulic systems, heat transfer and cooling systems, sealants and flame-retardant coatings, inks, adhesives, rubber products, plasticizers, carbonless copy paper, and paints.

43.

PCBs enter the natural environment in a variety of ways.  Many applications in which they were used—*e.g.*, coolants, flame retardants, plasticizers, paint—are known as "open applications" and allow the chemicals to enter the natural environment simply through use of the PCB-containing material.  Even where PCBs were used in "closed applications," for example in capacitors and transformers, PCBs nevertheless escaped from these systems through leaks, maintenance, or by volatilizing into the air.  And, because Monsanto did not tell the public of the dangers of PCBs, PCB-containing materials routinely were disposed of without regard to where the PCBs ultimately would end up.  For example, companies often left old transformers filled with PCB-containing oils on the ground outside or in junk yards, allowing PCB-containing oil to drain onto the ground.  As a result, hundreds of millions of pounds of PCBs have entered the natural environment, causing widespread contamination.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

C.    **Monsanto's PCBs Persist in Humans and in Wildlife and Throughout the Natural Environment.**

44.

PCBs are now found worldwide at measurable levels throughout the environment, including in soils and sediments, water, fish, and wildlife.[14]

45.

Once released into the environment, PCBs can migrate significant distances, transported by water or through the air.  Because they are water insoluble, PCBs tend to fall through the water column when they reach a waterway, ultimately binding to sediments or other particulates.  There, they either persist for centuries or are transported downstream with sediment.  PCBs also migrate through the air, either in the vapor phase or bound to particulates.

46.

PCBs enter the food chain when plants or animals ingest them.  The impact of PCBs on animals is magnified through a process known as "bioaccumulation."  Because PCBs are lipophilic, they tend to accumulate in animals' fatty tissues rather than be excreted by the animals' bodies.  Bioaccumulation starts when a small animal—perhaps an insect—ingests materials containing PCBs.  When a fish eats thousands of such insects over its lifetime, the PCBs in the insects accumulate in the fish's fatty tissues.  Over the life of the fish, the concentration of PCBs in its tissues can reach significant levels.  And, when a predator—*e.g.*, an eagle, whale, or human—eats PCB-contaminated fish, the concentration of PCBs will increase yet again.  Seals, whales, and eagles may eat thousands of fish over their lifetimes, and all the PCBs in those fish will remain in the predators' fatty tissues.  So intense are the effects of this bioaccumulation process that the remains of some orca whales have been treated as hazardous waste when they wash up on shore.

---

[14]    *IARC Monograph* at 74.

Page 14 -    **FIRST AMENDED COMPLAINT**

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

47.

After they enter the natural environment, PCBs also undergo a process known as "weathering." During the weathering process, a PCB compound goes through physical or chemical changes due to natural processes such as bacterial action, accumulative and metabolic processes in higher biological organisms, or exposure to ultraviolet radiation. As a result of those changes, PCB congener patterns found in humans and in wildlife often are different from, and sometimes more harmful or concentrated than, a congener pattern found in commercially produced PCB-containing materials.

48.

Human beings are exposed to PCBs through ingestion, inhalation, or direct contact with PCBs or PCB-containing materials and food. Humans may inhale PCBs that are emitted into the air, or they may be exposed through consumption of PCB-contaminated food or beverages. They may also absorb PCBs upon direct physical contact—for example, through direct contact with contaminated sediment at a swimming beach. Because PCBs bioaccumulate in fish and other wildlife species and in domestic animals, humans often are exposed through the consumption of PCB-contaminated fish and other food products.

49.

PCBs are transported through soil, sediment, air, and water. Because they attach so readily to particulate matter, they often are transported to remote areas far from the location of their initial release.

**D.    Monsanto Has Known Since 1937 That PCBs Are Toxic.**

50.

Today, it is commonly known that PCBs are some of the most toxic and persistent chemicals in our environment. Monsanto, however, has known that since at least 1937. And by at least the 1950s, if not earlier, Monsanto had overwhelming evidence that PCBs escaped into

Page 15 -   **FIRST AMENDED COMPLAINT**

the environment—even from closed systems—where they would persist indefinitely. Nevertheless, Monsanto continued to produce, market, and distribute these dangerous substances for decades, despite knowing they could cause serious and significant harm to the environment and to humans.

51.

Ample evidence shows that Monsanto knew of the dangers of PCBs very early on. For example, an internal Monsanto memorandum dated October 11, 1937, explained the toxic effects that Aroclors have on humans and animals:[15]

October 11, 1937.

Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.

Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption.

52.

The very next year, Dr. Cecil Drinker of the Harvard School of Public Health presented Monsanto with the findings of his research, which further explained the toxic effects of PCBs and demonstrated that PCB exposure resulted in permanent liver damage in test animals.[16]

---

[15]    "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. . . . Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."

[16]    Cecil K. Drinker, *Report to the Monsanto Chemical Company* (Sept. 15, 1938), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19380915_545.pdf.

Page 16 -   **FIRST AMENDED COMPLAINT**

Despite learning of the serious effects of PCB-exposure through this and other sources,

Monsanto nevertheless continued to produce PCBs without providing any warnings to the public

or its customers.

53.

On the rare occasions when its customers sought information about the hazards of PCBs,

Monsanto minimized and dismissed those risks.  For example, in December 1947, in response to

an inquiry from a customer, the Celanese Corporation of America, Monsanto directed the

Celanese Corporation to Drinker's publications and noted that, according to that research,

"Aroclor 1268 is almost non-toxic" but "[t]he vapors of other Aroclors studied are toxic and

should be avoided."

54.

Similarly, in 1949, Monsanto developed its own statement regarding the risks of Aroclor

that it would give to inquiring clients and customers.[17]  That statement read,[18]

> "TOXICITY – Prolonged exposure to AROCLOR vapours will lead to systemic toxic effects.  However, this is not significant except at high temperatures and then normal draught ventilation will remove any risk.  Acne-form skin eruptions may arise from continued bodily contact with liquid AROCLORS, but normal precautions and, if necessary, suitable garments provide adequate protection.  Toxic effects will follow considerable oral ingestion, but this hazard is unlikely to be encountered".

---

[17]    Interoffice Memorandum on Aroclor Toxicity from M.N. Strachan to J.R. Barrett (Aug. 30, 1949), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19490830_161.pdf.

[18]    "TOXICITY—Prolonged exposure to AROCLOR vapours will lead to systemic toxic effects. . . . Acne-form skin eruptions may arise from continued bodily contact with liquid AROCLORS, but normal precautions and, if necessary, suitable garments provide adequate protection.  Toxic effects will follow considerable oral ingestion, but this hazard is unlikely to be encountered."

Page 17 -   **FIRST AMENDED COMPLAINT**

55.

But, throughout that time, Monsanto knew PCBs were toxic.  For example, an internal

memorandum from Elmer P. Wheeler, Monsanto's Manager of Environmental Health, to

Mr. E. Mather, Monsanto's Chief Chemist, dated September 1, 1953, made clear that Monsanto

knew that "Aroclors cannot be considered nontoxic."

56.

In 1955, Mather authored an internal report summarizing the "Process for the Production

of Aroclors, Pyranols, etc. at the Anniston and at the Wm. G. Krummrich Plant."  Attached to

that report was an article authored by Robert M. Brown, Chief of the Industrial Hygiene Section

of the City of St. Louis Department of Public Welfare, entitled "On the Toxicity of the

'Aroclors'" and published in *The Chemical Analyst* in September 1947.  That article explains,

> There is need . . . to give warning [about PCBs].  For the toxicity of these
> compounds has been repeatedly demonstrated, both from the standpoint of their
> absorption from the inspired air, as well as from their effects in producing a
> serious and disfiguring dermatitis when allowed to remain in contact with the
> skin.

57.

Remarkably, and notwithstanding the abundance of research demonstrating that PCBs

have systemic toxic effects, Monsanto's Medical Director, Emmet Kelly, recommended to

Monsanto that it need not conduct any additional toxicity testing of the chemical.  The company

worried more about possible legal implications than any harm to humans or the environment:

```
MCC's position can be summarized in this fashion.   We know
Aroclors are toxic but the actual limit has not been pre-
cisely defined.   It does not make too much difference, it
seems to me, because our main worry is what will happen if
an individual developes any type of liver disease and gives
a history of Aroclor exposure.   I am sure the juries would
not pay a great deal of attention to MACs.
```

Page 18 -   **FIRST AMENDED COMPLAINT**

We, therefore, review every new Aroclor use from this point
of view.   If it is an industrial application where we can
get air concentrations and have some reasonable expectation
that the air concentrations will stay the same, we are much
more liberal in the use of Aroclor.   If, however, it is
distributed to householders where it can be used in almost
any shape and form and we are never able to know how much
of the concentration they are exposed to, we are much more
strict.   No amount of toxicity testing will obviate this
last dilemma and therefore I do not believe any more test-
ing would be justified.

Let's see what our discussions with Dr. Newman and yourself
bring out.

58.

Monsanto's disregard for human life and the environment, however, did not stop the most sophisticated consumers from conducting their own independent research on the hazards of PCBs.  For example, the U.S. Navy rejected the use of PCBs in its submarines because it concluded that PCBs were too dangerous.  The Navy reached that conclusion after conducting its own independent testing of PCBs, which revealed that "[t]he inhalation of 10 milligrams of [the PCB] Pydraul 150 per cubic meter or approximately 2 tenths of a part of the Aroclor component per million for 24 hours a day for 50 days caused, statistically, definite liver damage."  Monsanto tried to change the Navy's mind, but the Navy ultimately decided that PCBs simply "would not be suitable for use in submarines."[19]  The Navy informed Monsanto that it "would not accept Pydraul 150 and probably no other fluid containing chlorine or chlorinated diphenyls."[20]

59.

Since practically the beginning of its commercial production of PCBs, Monsanto was well aware of PCBs' toxic effects.  It knew that prolonged exposure to PCBs would lead to

---

[19]    Memorandum from Elmer P. Wheeler to Philip L. Slayton on Toxicity of Pydraul 150 (Sept. 25, 1957), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19570925_500.pdf.

[20]    *Id.*

Page 19 -   **FIRST AMENDED COMPLAINT**

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

systemic toxic effects in both humans and animals.  It knew that those systemic toxic effects

could be caused either by inhalation of PCB vapors or direct contact with PCBs or PCB-

containing materials.  It declined to conduct its own independent testing.  Others, however, did

conduct testing, and their research demonstrated that exposure to PCBs, even at relatively low

concentrations, was harmful to the health of both humans and the environment.

     E.     **Monsanto Also Knew, Since at Least the 1950s, That PCBs Escaped Into the Environment, Where They Would Persist and Destroy the Natural Environment.**

60.

Throughout the 1940s and 1950s, scientists continued to report to Monsanto on the

widespread, harmful effects of PCBs.  Dr. Kelly continued to find himself in the position of

having to explain, primarily to consumers of Monsanto products, that use of or exposure to

Monsanto's PCBs may have caused the harm that customer reported.[21]  Yet Monsanto continued

to increase the volume of PCBs it produced and sold.

61.

Meanwhile, public awareness of the harmful effects of chlorinated hydrocarbons—at the

time, primarily DDT—also increased.  Detailed accounts of the toxic effects of DDT on the

environment became more accessible to the public, triggering widespread concern for the

---

[21]     *See, e.g.*, Memorandum from R. Emmet Kelly to Richard Davis on Aroclor Exposure at Hexagon Laboratories (Feb. 2, 1961), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19610202_587.pdf ("Yesterday, Mr. Allen of the subject company called and stated he had two employees nauseated from exposure to a leak in a heat transfer unit that used Aroclor 1248."); Letter from Jack T. Garrett to S. Facini on Pydraul Exposure (Aug. 29, 1960), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19600929_176.pdf ("I would not expect [PCBs] to be very toxic to aquatic life.  On the other hand, this is a surmise on my part since we have no tests on aquatic animals."); Memorandum from R. Emmet Kelly to O.F. Heasel on Pydraul Exposure (June 23, 1959), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19590623_175.pdf ("I think [they] are being overcautious in this matter, but I certainly can't give Pydraul an absolutely clean bill of health . . . ."); Letter from Joseph P. Allen to Emmet Kelly on Aroclor Exposure at Hexagon Laboratories (Feb. 14, 1961), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19610214_177.pdf (noting, in a letter to Kelly, that "two . . . plant personnel were exposed to hot Arochlor (1248) vapors generated by a broken pipe connection [and] the two men developed symptoms of Hepatitis and were confined to a hospital for approximately two weeks").

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

continued use of chlorinated hydrocarbons more generally.  In 1962, for instance, Rachel Carson

authored *Silent Spring*, which was then known as the most thorough explanation, and effective

denunciation, of industry practice with respect to the use and misuse of chlorinated

hydrocarbons:

> In the less than two decades of their use, [dangerous chemicals] have been
> so thoroughly distributed throughout the animate and inanimate world that
> they occur virtually everywhere.  They have been recovered from most of
> the major river systems and even from streams of groundwater flowing
> unseen through the earth.  Residues of these chemicals linger in soil to
> which they may have been applied a dozen years before.  They have
> entered and lodged in the bodies of fish, birds, reptiles, and domestic and
> wild animals so universally that scientists carrying on animal experience
> find it almost impossible to locate subjects free from such
> contamination.  They have been found in fish in remote mountain lakes, in
> earthworms burrowing in the soil, in the eggs of birds—and in man
> himself.

62.

*Silent Spring* focused primarily on industry's use of DDT and other insecticide sprays

made of chlorinated hydrocarbons, but during the 1960s the scientific research on the

environmental and ecological effects of PCBs was also becoming more widely known.  As a

result, both the scientific community and Monsanto were becoming increasingly aware that

PCBs were just as poisonous as, if not more poisonous than, DDT.

63.

In 1966, an article summarizing the findings of Swedish researcher Soren Jensen was

published in an article in the Swedish daily paper, *Dagens Nyheter*.  The article described

Jensen's findings:

> [PCB] is found in salmon and in pike.  It is found in sea eagle living on fish.  It is
> found on the surface of the needles of the fir trees, it is in the air.  It is found in
> the hair of a [five-month-old] baby . . . .
>
> The scientists working with biocides have [found that] a group of poisons,
> Polychlorinated Biphenols (for short PCB) . . . are closely related to, and equally
> poisonous as, DDT.

**Page 21 -   FIRST AMENDED COMPLAINT**

PCB is broken down considerably slower than DDT and gives rise to damage of liver and skin.  PCB is not used as a[n] herbicide.  It is not manufactured in Sweden but is supposed to [be] used by the industry to quite some extent. . . .

Research Asst. S. Jensen has tested 200 fishes and a number of birds.  He has taken several samples of air and has reached the conclusion that PCB is equally common in Nature as chlorinated hydrocarbons of the type of DDT, DDE, and Lindane. . . .

Monsanto circulated the article internally and, shortly thereafter, visited Jensen at the Stockholm University to "discus[s his] programme of work."  Based on that discussion, Monsanto concluded that "there is no doubt that the chemical which is the subject of [Jensen's] investigation and the news release, is chlorinated diphenyl i.e. Aroclor."[22]



---

[22]     Memorandum from D. Wood to G.R. Buchanan on Soren Jensen Research (Jan. 26, 1967), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19670126_183.pdf

Page 22 -   **FIRST AMENDED COMPLAINT**

64.

Monsanto's own research, conducted in the waterways adjacent to its Anniston manufacturing facility, demonstrated the seemingly limitless potential of PCBs for environmental destruction.  In a study of bluegills caged in various locations, the results were dramatic:

> A branch of Snow Creek originating in the Monsanto Plant and flowing east . . . Result: All 25 fish lost equilibrium and turn on their sides in 10 seconds and all were dead in 3 ½ minutes.
>
> Snow Creek at a point where it is crossed by the Highway 21-Highway 78 cut-off . . . . Result: 10 fish were down after 1 hour and 40 minutes; all were down in 2 hours and 25 minutes.  All were dead in 2 hours and 35 minutes.
>
> . . . .
>
> Anniston Sewage Treatment Plan – near the out-flow to Choccolocco Creek. . . . Result: All 25 fish were dead when the first check was made after 23.5 hours.  Their condition suggested that they had died several hours earlier.[23]

65.

As Monsanto became more and more concerned about threats of negative publicity to its PCB business,[24] the reality of the toxic effects associated with the persistence of PCBs in the natural environment grew increasingly evident.  Monsanto received reports of significant fish kills in waterways adjacent to its manufacturing plants.  A 1968 study of Snow Creek, a waterway adjacent to Monsanto's Anniston plant, characterized the creek as "a potential source of future legal problems":[25]

---

[23]    Letter from Denzel Ferguson to L.C. Fuhrmeister on Caging Experiments (Nov. 2, 1966), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19661102_291.pdf

[24]    Memorandum from R. Emmet Kelly to D. Wood on Response to Aroclor Reports (Feb. 10, 1967), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19670210_586.pdf ("We are very worried about what is liable to happen in the states when the various technical and lay news media pick up the subject.  This is especially critical at this time because air pollution is getting a tremendous amount of publicity in the United States.").

[25]    Monsanto Chemical Company, Investigations of Certain Pesticide-Wildlife Relationships in the Choccolocco Creek Drainage (Sept. 1, 1966—Aug. 31, 1967), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19670831_186.pdf.

Page 23 -  **FIRST AMENDED COMPLAINT**

A FINAL REPORT

Investigations of Certain Pesticide-Wildlife

Relationships in the Choccolocco Creek Drainage

⎯A Contract Between the

Monsanto Chemical Company and

Mississippi State University

(September 1, 1966 through August 31, 1967)

3. Snow Creek is a potential source of future legal problems. The
stream does not support life and contains many materials that
accumulate in water, fish, and muds downstream. Although there
is no evidence that these materials are harmful to fish, their
presence constitutes damaging evidence of pollution. The argument
that these compounds impart undesirable palatability qualities to
Choccolocco Creek fish would be very convincing and probably easy
to prove.

66.

    In December 1968, Richard Risebrough, a researcher at the Institute of Marine Resources and the University of California-Berkeley, published a report entitled *Chlorinated Hydrocarbons in Marine Ecosystems* that identified chlorinated hydrocarbons generally as "the most abundant synthetic pollutants present in the global environment." The article reported significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

Page 24 -   **FIRST AMENDED COMPLAINT**

Internally, Monsanto employees acknowledged that "Risebrough has found PCBs along with chlorinated pesticides in a number of species of fish and birds along the California coast as well as in waters off Baja California and Central America."[26]

67.

By January of the following year, Monsanto employees recognized the need to respond, if only internally.  In a memo dated January 23, 1969, and designated as "C-O-N-F-I-D-E-N-T-I-A-L," Monsanto's Paul Hodges, an official in its St. Louis General Offices, noted the need for Monsanto to begin to "protect" itself:



68.

Monsanto therefore formed an "Aroclor Ad Hoc Committee," and tasked that committee with preparing recommendations for actions that Monsanto could take to improve its reputation

---

[26]    Memorandum from Elmer P. Wheeler to W.H. Richard on Polychlorinated Biphenyls in the Environment (Oct. 21, 1968), http://www.chemicalindustryarchives.org/search/pdfs/anniston/19681021_305.pdf.

Page 25 -   **FIRST AMENDED COMPLAINT**

and salvage its bottom line, notwithstanding the now publicly known damage resulting
worldwide from PCBs.  The committee's charge was to develop a plan that would:

1. Permit continued sales and profits of Aroclors and Terphenyls.

2. Permit continued development of uses and sales.

3. Protect [the] image of Organic Division and of the Corporation.[27]

69.

Monsanto's Aroclor Ad Hoc Committee first met on September 5, 1969.  At that
meeting, the committee acknowledged that PCBs had been found in fish, oysters, shrimp, birds,
and in and "[a]long coastlines of industrialized areas such as Great Britain, Sweden, Rhine River,
low countries, Lake Michigan, Pensacola Bay, and in Western wild life."  The committee was
aware that PCBs "may be a global contaminant."  Moreover, the committee knew that ordinary
usage of Monsanto's own PCB-containing materials was a cause of the environmental problem:

> 8.  Environmental Contamination by Customers:
>
> Our in-plant problems are very small vs. problems of
> dealing with environmental contamination by customers.
> In one application alone (highway paints), one million
> lbs/year are used.  Through abrasion and leaching we
> can assume that nearly all of this Aroclor winds up in
> the environment.

70.

The Aroclor Ad Hoc Committee issued a confidential report on October 2, 1969.  In that
report, the Committee explained its overall findings:

> The committee believes there is little probability that any action that can be taken
> will prevent the growing incrimination of specific polychlorinated biphenyls (the
> higher chlorinated—e.g. Aroclors 1254 and 1260) as nearly global environmental
> contaminants leading to contamination of human food (particularly fish), the
> killing of some marine species (shrimp), and the possible extinction of several
> species of fish eating birds.

---

[27]    Confidential Minutes of Aroclor "Ad Hoc" Committee First Meeting (Sept. 5, 1969),
http://www.chemicalindustryarchives.org/search/pdfs/anniston/19690905_200.pdf.

Page 26 -   **FIRST AMENDED COMPLAINT**

> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination. There are, however, a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.

(Emphasis added.)

71.

On September 9, 1969, Monsanto employee W.R. Richard, who was a member of the Aroclor Ad Hoc Committee, wrote an interoffice memorandum entitled "Defense of Aroclor," in which he acknowledged that "[w]ater [p]ollution seems to be [the] first issue" with Aroclor: "Aroclor product is refractive, will settle out on solids—sewerage sludge—river bottoms, and apparently has a long life." He noted that Aroclors 1254 and 1260 had been found in shrimp along Florida's Gulf Coast; in the San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes. Richard also acknowledged that the company could not defend itself entirely:

> We can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately.

72.

On January 29, 1970, Wheeler, Monsanto's Manager of Environmental Health, circulated laboratory reports discussing results of animal studies. He noted,[28]

Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals.

---

[28] "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."

Page 27 -    **FIRST AMENDED COMPLAINT**

73.

Rather than take steps to correct the impact that Monsanto's poisonous materials were likely to have on the natural environment, Monsanto opted instead to take steps that would continue to improve Monsanto's reputation and bottom line.  Although Wheeler recognized that ignoring the environmental havoc that the PCBs would wreak worldwide was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint," he ultimately concluded that Monsanto's profits were more important: "[T]here is too much customer/market need and selfishly too much Monsanto profit to go out" to take any action to the contrary.

74.

In an interoffice memorandum circulated on February 16, 1970, and entitled "Pollution Letter," Monsanto provided talking points for its employees when discussing the dangers of PCBs with inquiring customers: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  But the memorandum also acknowledged that Monsanto "will continue to make" PCBs; "[w]e can't afford to lose one dollar of business," and admonished employees not to take any product back: "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new fluids] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and 1260 will be out of his system.  We don't want to take fluid back."  (Emphasis in original.)

75.

In 1970, the year after Monsanto formed the Aroclor Ad Hoc Committee, and despite Monsanto's knowledge of the global nature of PCB contamination, PCB production in the United States peaked at 85 million pounds.

76.

Growing awareness of the ubiquity of PCBs led the U.S. Government to conduct an investigation of PCBs' health and environmental effects and any resulting contamination of food

Page 28 -  **FIRST AMENDED COMPLAINT**

and other products.  In May 1972, an interdepartmental government task force published a report confirming that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse effects on human health.[29]

77.

After that report, environmental sampling and studies suggested that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[30]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a nationwide basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; in sewage treatment facilities; in a variety of foods, including milk, poultry, eggs, fish, meat, and grains; and in human milk, blood, hair, and tissues.

78.

At the same time, Monsanto continued to promote the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire and cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.  According to the brochure, Aroclors also could be used as a component of any of the following: automotive transmission and industrial cutting oils; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; adhesives; moisture-proof, tack, masonry, and other coatings; printing

---

[29]    Participating agencies included, among others, EPA and the Departments of Agriculture; Commerce; Health, Education, and Welfare; and the Interior.  *See generally* Interdepartmental Task Force on PCBs, *Polychlorinated Biphenyls and the Environment* (May 1972).

[30]    Environmental Protection Agency Office of Toxic Substances, *Review of PCB Levels in the Environment*, at 1 (Jan. 1976).

Page 29 -  **FIRST AMENDED COMPLAINT**

inks; papers; mastics; sealant; caulking compounds; plasticizers; resin; paints, varnishes, and lacquers; railway tank and gondola cars; and wood and metal maritime equipment.

79.

A 1961 company brochure explained that Monsanto's Aroclors were being used in a wide variety of common household items, including in "lacquers for women's shoes"; as "a wax for the flame proofing of Christmas trees"; as floor wax; as an adhesive for bookbinding, leather, and shoes; and as invisible marking ink used to make chenille rugs and spreads.

80.

During the entirety of the 1960s, and probably before, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Indeed, Monsanto encouraged these uses by affirmatively urging salesmen to market products for these and other applications.

81.

A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years earlier. In a press release, the company claimed, "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item." Yet, in 1970, Monsanto was still marketing and selling Aroclor as a compound for use in common household items.

**F.    Monsanto Concealed the Harmful Effects of PCBs From Consumers and Government Entities.**

82.

While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented those facts, telling consumers, the public, and government entities the exact opposite—that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.

Page 30 -   **FIRST AMENDED COMPLAINT**

83.

For example, in a March 24, 1969, letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."  A similar Monsanto letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."

84.

In May 1969, Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."  This is the same Wheeler who, only seven months later, circulated internally to Monsanto executives laboratory reports showing that PCBs were as toxic as DDT in mammals.

85.

Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first that, "[b]ased on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."  The letter then reiterated Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment.  It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."

Page 31 -   **FIRST AMENDED COMPLAINT**

**G.  Land, Waters, and Natural Resources Owned or Held in Trust by the State of Oregon Have Been Impaired by PCB Contamination.**

86.

The State of Oregon, by and through the Department of State Lands (DSL), owns or holds in trust for the benefit of the public approximately 2.8 million acres of land, as well as the waters of all navigable or tidally influenced rivers, waterways, and lakes within the State.  The remaining surface and groundwater, from all sources of supply and prior to capture, is also held in trust by the State for the benefit of the public.  The State, as trustee, holds title to such waters subject to the public's right to use the water for various beneficial purposes.

87.

In its capacity as trustee of all natural resources situated within its borders, the State has the authority to protect and preserve, for the benefit of the public, those natural resources, including public waters, from impairment and harm.

88.

As a result of Monsanto's manufacture, sale, and distribution of PCBs throughout the United States, including in Oregon, Monsanto's PCBs continue to persist throughout Oregon's natural environment.

89.

Pursuant to its authority under state law, the State has investigated, monitored, and detected the presence of PCBs on its lands, in its waters, and in various wildlife species and other public trust resources within its borders.

90.

State-owned waters in which PCBs are known to persist include but are not limited to:

a.  Portland Harbor,

b.  Lower Columbia River,

c.  Middle Columbia River,

d.  Coos Bay,

Page 32 -  **FIRST AMENDED COMPLAINT**

    e.   Columbia Slough,

    f.   Johnson Creek,

    g.   Coffee Lake Creek,

    h.   Mill Creek,

    i.   Pringle Creek,

    j.   Willamette River,

    k.   Tualatin River,

    l.   Upper and Lower John Day Rivers,

    m.  Middle Fourth Lake, and

    n.   Muddy Creek.

<u>The Portland Harbor</u>

91.

The area of the lower Willamette River immediately upstream of its confluence with the Columbia River generally is known as the "Portland Harbor."  In December 2000, EPA, pursuant to its authority under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), identified the Portland Harbor area as a "Superfund Site" and placed it on the National Priorities List.

92.

The Portland Harbor Superfund Site includes an approximate 10-mile stretch of the Willamette River, between river mile (RM) 1.9 and RM 11.8.[31]  The upstream end of the Portland Harbor Superfund Site is currently located near the Broadway Bridge in downtown Portland.  The Superfund Site area is approximately 2,190 acres and includes both in-river and upland areas.

---

[31]    Measured from confluence of the Willamette River with the Columbia River.

Page 33 -  **FIRST AMENDED COMPLAINT**

93.

The presence of PCBs in the lower Willamette River, the lower Columbia River, Multnomah Channel, and the sediments of those waterways, was a significant factor in EPA's decision to place the Portland Harbor on the National Priorities List and require potentially responsible parties to remediate PCB-related contamination.

94.

The Portland Harbor is characterized by its wide variety of commercial, industrial, residential, recreational, and agricultural uses. Its waterfront land and harbor uses generally consist or consisted of ship building; wood products manufacturing and treating; metal recycling, production, and fabrication; manufactured gas production; electrical production and distribution; fuel storage; asphalt manufacturing; marine operations; and rail.

95.

Many of the industrial landowners and users along the Portland Harbor waterfront handled, used, and disposed of Monsanto's PCBs or PCB-containing materials. Transformers used in wood products manufacturing and treatment operations, for instance, contained PCBs that were released into the natural environment. Ancillary operations associated with metal recycling, production, and fabrications were known to cause releases of PCBs used in hydraulic fluids and other products. Industrial uses relating to electrical production and distribution resulted in the handling and disposal of dielectric fluids containing PCBs. PCBs are also known contaminants associated with steel mills, smelters, foundries, and railyards, all of which are significant components of the Portland Harbor industrial landscape.

96.

Four categories of entities are jointly and severally liable to clean up and remediate a contaminated site: the current owners or operators of the site, the owners or operators of the site at the time the hazardous materials were disposed of at the site, anyone who generated hazardous waste that was disposed of at the site or who arranged to dispose of hazardous material at the

Page 34 -   **FIRST AMENDED COMPLAINT**

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

site, and anyone who transported hazardous material to the site.[32]  Together, these parties are

known as "potentially responsible parties" ("PRPs").

97.

The State, by and through DSL, holds the bed and banks of the lower Willamette River,

the Columbia River, and Multnomah Channel, including the Portland Harbor Superfund Site, in

trust for the people of Oregon.  As a result, EPA has identified the State of Oregon as a PRP in

the Portland Harbor.[33]  As a PRP, the State, through DSL, faces significant potential liability for

cleanup costs in the Portland Harbor, and has already spent millions of dollars in defense and

investigation costs related to the presence of PCBs in the Portland Harbor.

98.

EPA has also identified the State of Oregon, by and through its Department of

Transportation (ODOT), as a PRP in the Portland Harbor.  As a PRP, the State, through ODOT,

faces significant potential liability for cleanup costs in the Portland Harbor, and has already spent

millions of dollars in defense costs related to the presence of PCBs in the Portland Harbor.

Other State-Owned Waterways

99.

The State has also investigated, monitored, and detected the presence of PCBs in certain

other state-owned waterways at concentrations that are hazardous to human health and the

environment.  Those waterways include, but are not limited to, the following:

    a.  The Lower Columbia River, between RM 0 and RM 142, contains elevated levels

        of PCBs.  Levels of PCBs in excess of health criteria have been measured in

        various species of fish, and the Oregon Health Authority has issued fish

---

[32]     *See* Comprehensive Environmental Response, Compensation, and Liability Act
(CERCLA), 42 U.S.C. § 9607(a) (2016).

[33]     EPA Region 10, Portland Harbor Superfund Site, List of Potentially Responsible Parties,
*available at* https://www3.epa.gov/region10/pdf/ph/uplands/gnl_address_list_september_
2014.pdf (last visited Dec. 6, 2017).

Page 35 -  **FIRST AMENDED COMPLAINT**

consumption advisories pertaining to all resident fish in the one-mile section of the waterway between Bonneville Dam at Bradford Island and Ruckel Creek, and a crayfish and clam advisory for the pool behind Bonneville Dam, due to elevated PCB levels.  Studies have also shown that the reproductive patterns of the bald eagle have been impaired in areas along the Lower Columbia River as a result of PCB contamination.

b.  The Middle Columbia River, between RM 142 and RM 287.1, contains elevated levels of PCBs.  Levels of PCBs in excess of health criteria have been measured in various species of fish, and the Oregon Health Authority has issued fish consumption advisories pertaining to all resident fish in the section of the waterway between Ruckel Creek and McNary Dam as a result of PCB contamination.

c.  Coos Bay, between RM 7.8 and 12.3, contains elevated levels of PCBs.  PCB concentrations throughout Coos Bay exceed guideline values.

d.  The Clackamas River, between RM 0 and 22.9, contains elevated levels of PCBs.  PCB concentrations throughout the Clackamas River exceed guideline values.

e.  Columbia Slough, between RM 0 and 8.5, contains elevated levels of PCBs.  Levels of PCBs in excess of health criteria have been measured in various species of fish, and the Oregon Health Authority has issued fish consumption advisories pertaining to all resident fish in the waterway as a result of PCB contamination.

f.  Johnson Creek, between RM 0 and 23.7, contains elevated levels of PCBs.  Studies performed by the Oregon Department of Environmental Quality (DEQ) show that levels of PCBs are steadily increasing.

g.  Coffee Lake Creek, between RM 0 and 5, contains elevated levels of PCBs.  PCB concentrations throughout Coffee Lake Creek exceed guideline values.

Page 36 -   **FIRST AMENDED COMPLAINT**

h.  Mill Creek, between RM 0 and 25.7, contains elevated levels of PCBs.  PCB concentrations throughout Mill Creek exceed guideline values.

i.  Pringle Creek, between RM 0 and 6.2, and its tributary between RM 0 and 2.8, both contain elevated levels of PCBs.  PCB concentrations throughout both reaches exceed guideline values.  The waters of Pringle Creek and its tributary provide aquatic and wildlife habitat and are used for fishing, recreation, and drinking water consumption.

j.  The Willamette River, between RM 0 and 72, contains elevated levels of PCBs.  PCB concentrations throughout the reach exceed guideline values.  Levels of PCBs in excess of health criteria have been measured in various species of fish.  The waters of the Willamette River provide aquatic and wildlife habitat and are used for fishing, recreation, and drinking water consumption.

k.  Middle Fourth Lake, in the Upper Willamette watershed, contains elevated levels of PCBs.  The waters of Middle Fourth Lake provide aquatic and wildlife habitat and are used for fishing, recreation, and drinking water consumption.  The lake is also known as a resource for anadromous fish passage.

l.  Muddy Creek, between RM 0 and 56.2, and in its tributary between RM 0 and 1.2, both contain elevated levels of PCBs.  PCB concentrations throughout both reaches exceed guideline values.  The waters of Muddy Creek and its tributary provide habitat for local aquatic life and other animals.

100.

The waters described above, among others, constitute essential habitat for various species of fish, birds, invertebrates, reptiles, mammals, and plants.  The presence of PCBs in those waters has caused the contamination of, and in some cases injury to or destruction of, fish, wildlife, and fish and wildlife habitat throughout Oregon.

Page 37 -  **FIRST AMENDED COMPLAINT**

Orphan Sites

101.

"Orphan Sites" are properties not owned by the State that have been contaminated by a release of hazardous substances posing serious threats to human health or the environment and for which no responsible party is currently known or able to pay remediation costs, or for other reasons called for DEQ to take action before identifying a responsible party. Oregon law permits DEQ to undertake any removal or remedial actions necessary to protect public health, safety, welfare, and the environment, and authorizes the State, by and through DEQ, to take any action necessary to conduct such removal or remedial actions and to carry out the policies and provisions of Oregon's environmental laws.

102.

Pursuant to that authority, DEQ has conducted PCB-related removal and/or remediation activities, including but not limited to monitoring, testing, investigating, sampling, planning, engineering, design, construction, maintenance, or enforcement, at the following designated Orphan Sites:

    a. Orphan Site 1 (ESCI Database No. 88),[34] designated as Nuway Oil Company and located in Multnomah County;

    b. Orphan Site 2 (ESCI Database No. 139), designated as NW Pipe & Casing Parcels A & B and located in Clackamas County;

    c. Orphan Site 3 (ESCI Database No. 178), designated as the UPRR Albina Yard and located in Multnomah County;

    d. Orphan Site 4 (ESCI Database No. 277), designated as the University of Portland River Campus and located in Multnomah County;

---

[34] "ESCI Database" refers to the Environmental Cleanup Site Information Database, a publicly available database of cleanup sites maintained by DEQ.

Page 38 -   **FIRST AMENDED COMPLAINT**

e.   Orphan Site 5 (ESCI Database No. 764), designated as Black Dog Slough and located in Linn County;

f.   Orphan Site 6 (ESCI Database No. 1370), designated as the Astoria Plywood Corporation and located in Clatsop County;

g.   Orphan Site 7 (ESCI Database No. 1383), designated as Stantosh Landfill and located in Columbia County;

h.   Orphan Site 8 (ESCI Database No. 1703), designated as Burns Air Force Station and located in Harney County;

i.   Orphan Site 9 (ESCI Database No. 1906), designated as Mid-Coast Marine and located in Coos County;

j.   Orphan Site 10 (ESCI Database No. 2082), designated as Hoy's Marine and located in Lincoln County;

k.   Orphan Site 11 (ESCI Database No. 2251), designated as Killingsworth Fast Disposal Landfill and located in Multnomah County;

l.   Orphan Site 12 (ESCI Database No. 2352), designated as Marine Finance Company and located in Multnomah County;

m.   Orphan Site 13 (ESCI Database No. 2382), designated as Merrill Auto Wrecking, Inc. and located in Tillamook County; and

n.   Orphan Site 14 (ESCI Database No. 3314), designated as B&M Equipment and located in Malheur County.

103.

The State has incurred significant remediation costs associated with cleanup activities on designated Orphan Sites.  The State anticipates that it will incur additional remedial action costs as necessary to complete the recommended remediation activities on the designated Orphan Sites.

Page 39 -   **FIRST AMENDED COMPLAINT**

Other State-Owned Lands and Public Trust Resources

104.

In addition to the Orphan Sites described above, the State, primarily through DSL and ODOT, owns various other properties throughout the State, many of which have been impacted by the presence of Monsanto's PCBs.  Those properties include, but are not limited to, upland properties nearby or adjacent to waterways contaminated by PCBs and public rights-of-way along roadways owned and managed by ODOT.

105.

Additionally, Monsanto's PCBs have been detected in the tissues of various fish and wildlife species throughout Oregon.  Among those include fish species sampled from the following watershed areas: Alsea, Applegate, Clackamas, Coast Fork Willamette, Coos, Coquille, Donner and Blitzen, Little Deschutes, Lost, Lower Columbia, Lower Crooked, Lower Deschutes, Lower John Day, Lower Rogue, Lower Willamette, McKenzie, Middle Columbia-Hood, Middle Columbia-Lake Wallula, Middle Fork Willamette, Middle Owyhee, Middle Rogue, Middle Snake-Payette, Middle Snake-Succor, Middle Willamette, Necanicum, Nehalem, North Santiam, Siletz-Yaquina, Siuslaw, Sixes, South Umpqua, Tualatin, Umatilla, Umpqua, Upper Crooked, Upper Deschutes, Upper John Day, Upper Klamath Lake, Upper Willamette, Wilson-Trask-Nestucca, and Yamhill.

106.

Through the process of bioaccumulation, the concentrations of Monsanto's PCBs in the fish species described above will only continue to increase.  And, when other Oregon predators—*e.g.*, an eagle or other bird, whale, or human—eats any of the fish species in the Oregon watersheds listed above, the concentration of PCBs will increase yet again.  The PCBs will remain in the predators' fatty tissues and will cause significant adverse effects to their health and to their surrounding environment.

Page 40 -  **FIRST AMENDED COMPLAINT**

**FIRST CLAIM FOR RELIEF**
**(Public Nuisance)**

107.

Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

108.

Defendants' production and use of PCBs in the various chemical and industrial applications described above caused the continuous presence of PCBs on lands and in waters owned, controlled, or held in trust by the State.

109.

The continuous presence of PCBs on lands and in waters that Plaintiff owns or holds in trust for the benefit of the public presents significant risks to the health of humans, fish, wildlife, and the environment in the State of Oregon and constitutes an unreasonable and unnatural interference with the use of such lands and waters, which is contrary to the public policy of this state.

110.

The continuous presence of PCBs on lands and in rivers, waterways, and lakes that Plaintiff owns or holds in trust for the benefit of the public constitutes a *per se* public nuisance.

111.

The continuous presence of PCBs on lands and in rivers, waterways, and lakes that the State owns or holds in trust for the benefit of the public substantially, continuously, and unreasonably interferes with interests and rights of the general public to be free from injury to public health, safety, and welfare.  It further interferes with the interests of the general public in the preservation of Oregon's natural resources—including fish, wildlife, and habitat—which the State is obligated to hold in trust for the benefit of, and for use by, members of the general public.  As alleged above, Oregon has also incurred significant costs at Orphan Sites and elsewhere in abating the nuisance caused by Defendants.

Page 41 -   **FIRST AMENDED COMPLAINT**

112.

As early as 1937, Defendants knew, should have known, or were reckless in not knowing that once the PCBs that it had produced were released into the environment, such interferences with the interests of the general public were substantially certain to occur.

113.

Defendants' internal communications about the toxic and carcinogenic properties of PCBs make clear that Defendants understood that, once PCBs were released into the environment, it was highly probable that the PCBs would remain in the environment and present serious risks to the health of humans, wildlife, and the environment.  Defendants continued, however, to release PCBs into the environment without informing the general public of those toxic and carcinogenic properties.

114.

By way of their decisions to release PCBs into the environment on a widespread basis without informing the general public of the risks that PCBs presented to the health of humans, fish, wildlife, and the environment, Defendants engaged in ultrahazardous conduct and acted in a manner that was consciously indifferent to the health, safety, and welfare of the general public and the natural environment.

115.

As a result of Defendants' conduct, Plaintiff has incurred damages and is entitled to compensation therefor.  Plaintiff also seeks abatement of the nuisance caused by Defendants that has not yet been cleaned up or remediated.  Plaintiff further intends to amend this Complaint to seek punitive damages pursuant to ORS 31.725.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## SECOND CLAIM FOR RELIEF
### (Purpresture)

116.

Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

117.

Defendants' production and use of PCBs in the various chemical and industrial applications described above have resulted in the continuous presence of PCBs on lands and in waters to which Plaintiff holds title as described in this Complaint.

118.

The continuous presence of PCBs on lands and in waters to which Plaintiff holds title constitutes an encroachment on public rights by appropriation for private use, in violation of the proprietary ownership interest that the State holds in those lands and waters.

119.

The presence of those PCBs on lands and in waters to which Plaintiff holds title interferes with public navigation by, for example, increasing the costs of dredging, and interferes with the public use and enjoyment of lands and waterways held by the State by limiting fishing, swimming, and other uses of those lands and waterways.

120.

The continuous presence of PCBs on and in waters to which Plaintiff holds title is a direct result of and is caused by Defendants' manufacture and sale of PCBs, and that presence constitutes a purpresture.

121.

As a result of Defendants' conduct, Plaintiff has incurred damages and is entitled to compensation therefor.  Plaintiff also seeks abatement of PCB-related contamination on all lands and in all waters to which Plaintiff holds title.  Plaintiff further intends to amend this Complaint to seek punitive damages pursuant to ORS 31.725.

Page 43 -   **FIRST AMENDED COMPLAINT**

## THIRD CLAIM FOR RELIEF
### (Trespass)

122.

Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

123.

Defendants' production and use of PCBs in the various chemical and industrial applications described above has resulted in the continuous presence of PCBs on lands, in waters, and in other public trust resources that Plaintiff owns, possesses, controls, or holds in trust for the benefit of the public.

124.

The presence of PCBs on Plaintiff's property—including land, waters, and other public trust resources—interferes with Plaintiff's interest in the exclusive possession of that property and thereby constitutes a trespass. Defendants' conduct allowed or caused that interference to occur. Their conduct was and is negligent, reckless, intentional, and/or abnormally dangerous. Defendants had no license or other authorization to enter onto or leave contaminants on property that Plaintiff possesses. Any compliance by Defendants with applicable laws or permit conditions does not excuse Defendants' interference.

125.

As early as 1937, Defendants knew that once the PCBs that it produced were released into the environment, they were likely to remain in, and be transported throughout, the environment on a widespread basis. Thus, as early as 1937, Defendants knew, should have known, or were reckless in not knowing, that Defendants' decision to continue to release PCBs into the environment would likely result in interferences with the interests that Plaintiff has in the exclusive possession of its property.

Page 44 -   **FIRST AMENDED COMPLAINT**

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

126.

The interference that Defendants' conduct has caused with Plaintiff's exclusive possession of property that Plaintiff owns, possesses, controls, or holds in trust for the benefit of the public is a continuing interference that, since at least the 1960s, Defendants have known of or have allowed to persist.

127.

By way of their decisions to release PCBs into the environment on a widespread basis without informing the general public of the risks that PCBs present to the health of humans, fish, wildlife, and the environment, Defendants engaged in ultrahazardous conduct.

128.

As a result of Defendants' conduct, Plaintiff has incurred damages and is entitled to compensation therefor.  Plaintiff further intends to amend this Complaint to seek punitive damages pursuant to ORS 31.725.

## FOURTH CLAIM FOR RELIEF
### (Equitable Indemnity)

129.

Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

130.

Oregon law provides the State, by and through DEQ, the authority to undertake remedial action when necessary or appropriate to abate hazards to the public health, safety, welfare, and the environment.  Pursuant to that authority, the State may use funds available from the Hazardous Substance Remedial Action Fund ("the Fund") when remedial action is necessary at Orphan Sites—*i.e.*, sites not owned by the State for which the party responsible for the contamination is unknown, unwilling, or unable to undertake the recommended remedial action.

Page 45 -   **FIRST AMENDED COMPLAINT**

The purpose of the Fund, and the purpose of any remedial action paid for by the Fund, are to protect public health, safety, welfare, or the environment.

131.

Plaintiff has incurred significant costs to monitor, investigate, and remediate the existence of PCBs at designated Orphan Sites.  Given the number of Orphan Sites contaminated by PCBs and for which the State may assume responsibility in the immediate future, Plaintiff anticipates that it will incur significant additional remedial action costs.

132.

Plaintiff, through DEQ, has also incurred costs associated with its roles as lead agency for source control actions at various Portland Harbor upland sites and as support agency for EPA's in-water cleanup in areas throughout the Portland Harbor.  A portion of those costs will not be reimbursed to Plaintiff by other responsible parties or by EPA.  Additionally, Plaintiff, through DSL and ODOT, has received general notice letters identifying DSL and ODOT as PRPs in the Portland Harbor.  As PRPs, DSL and ODOT potentially will incur a share of liability for remedial action costs associated with PCB contamination in areas throughout the Harbor.

133.

Plaintiff, though DEQ, has incurred additional costs to develop and administer its toxic monitoring program and to develop Total Maximum Daily Load (TMDL) estimates for certain waterways known to be contaminated by Monsanto's PCBs, among other regulatory costs related to PCBs.

134.

Defendants, not Plaintiff, are responsible for the presence of PCBs, and the contamination, trespass, and nuisance resulting therefrom, on each of the designated Orphan Sites and in other areas throughout the State for which Plaintiff has incurred or will incur remedial action, toxic monitoring, or other costs.  Plaintiff did not contribute in any way to the presence of PCBs on any properties within its borders, or to the contamination, trespass, or

Page 46 -   **FIRST AMENDED COMPLAINT**

nuisance resulting therefrom.  Accordingly, Defendants, and not Plaintiff, are liable for associated damages arising from the presence of Defendants' PCBs on any of those properties.

135.

As a result, as between Defendants and Plaintiff, Defendants should ultimately be responsible for the payment of remedial action costs, including costs to monitor, investigate, and clean up PCB contamination in the areas described above.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment)

136.

Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

137.

Under the laws of Oregon, Monsanto owed a duty to Plaintiff and to the public to prevent its PCBs from interfering with the use and/or possession of property it does not own and from causing harm to human health and the environment.

138.

Defendants' production and use of PCBs in the various chemical and industrial applications described above have resulted in the continuous presence of PCBs on lands and in waters that Plaintiff owns, possesses, controls, or holds in trust for the benefit of the public, including but not limited to State-owned lands, State-owned waterways, and Orphan Sites.

139.

The presence of Defendants' PCBs on lands and in waters that Plaintiff owns, possesses, controls, or holds in trust for the benefit of the public poses an ongoing, serious threat to Oregon's public health, safety, welfare, and the environment.  As described above, Defendants' PCBs already have caused, and will continue to cause, significant damage to, among other resources, Oregon's fish and wildlife and habitat areas.

Page 47 -   **FIRST AMENDED COMPLAINT**

140.

Because of the damage that PCBs have caused to the natural environment, and in order to abate continuing hazards that PCBs pose to public health, safety, welfare, and the environment, Plaintiff has undertaken remedial actions to monitor, investigate, and remove the PCBs in contaminated areas.  As a result, Plaintiff has incurred significant remedial action costs.  Based on information gathered through toxic monitoring and investigation, Plaintiff anticipates that it will incur additional remedial action and other costs to monitor, investigate, and abate continuing hazards to public health, safety, welfare, and the environment.

141.

By way of Plaintiff having undertaken remedial actions necessary to abate the hazard created by Defendants' PCBs, certain economic benefits, including but not limited to the following, have been conferred upon or acquired by Defendants:

a.  Reduction in the costs Defendants would have incurred, or in the future will incur, to monitor and investigate the existence of and damages caused by the presence of PCBs in Oregon's natural environment;

b.  Reduction in the costs that Defendants would have incurred, or in the future will incur, to remediate the damages caused by the presence of PCBs in the natural environment, including damages to Oregon's lands, waters, fish, wildlife, and habitat areas;

c.  Other and further economic benefits relating to the existence of Monsanto's PCBs in Oregon's natural environment, the retention of which by Monsanto would be unjust.

142.

Given its duty and otherwise legally enforceable obligation to prevent its PCBs from interfering with the use and/or possession of property it does not own and from causing harm to human health and the environment, Defendants' retention of the benefits described above, without compensation therefor, would be unjust.

Page 48 -   **FIRST AMENDED COMPLAINT**

143.

As a result, and to prevent Defendants from being unjustly enriched by its retaining the economic benefits described above, Plaintiff seeks restitution.

**SIXTH CLAIM FOR RELIEF**
**(Natural Resource Damages—ORS 468B.060)**

144.

Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

145.

The presence and persistence of PCBs on lands and in waters that the State either owns or holds in trust for the benefit of the public has altered the physical, chemical, and biological properties of those lands and waters in a manner that is detrimental to those lands and waters and to Oregon's environment.

146.

The presence and persistence of PCBs on lands and in waters that the State either owns or holds in trust for the benefit of the public has caused injury, death, contamination, and destruction of fish, wildlife, and fish and wildlife habitat within and throughout Oregon.

147.

Specifically, the presence and persistence of PCBs has caused or contributed to the physical injury, death, population decline, and contamination of fish and wildlife throughout Oregon.

148.

Defendants are responsible for the pollution of, and those damages to, the natural resources described above.

Page 49 -  **FIRST AMENDED COMPLAINT**

149.

At least 60 days before amending this Complaint to add this claim, Plaintiff, through its Attorney General, Ellen Rosenblum, the Department of Fish and Wildlife (ODFW), and the Oregon Department of Environmental Quality (DEQ), served on Defendants a notice demanding that Defendants pay all costs to restore fish and wildlife production in the affected areas, including habitat restoration, and to compensate Plaintiff for the value of the fish and wildlife injured or destroyed as a result of Defendants' actions. Defendants have not paid any amount demanded in the notice.

150.

Pursuant to ORS 468B.060, Plaintiff is entitled to damages in an amount equal to the value of the fish and wildlife injured or destroyed as a result of Monsanto's conduct and for all costs to restore fish and wildlife production in the affected areas, including habitat restoration.

151.

Plaintiff does not seek natural resource damages pursuant to ORS 468B.060 for natural resources in the Portland Harbor Superfund Site that already are the subject of the ongoing Natural Resource Damages Assessment relating to EPA's Portland Harbor Superfund Site allocation process.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

1.    An order to abate the public nuisance caused by the continuous presence of PCBs on lands and in waters that the State owns, possesses, controls, or holds in trust for the benefit of the public; an order to remove and remediate PCB-related contamination on all lands and in all waters that the State owns, possesses, controls, or holds in trust for the benefit of the public; an order of restitution in an amount be proven at trial; and/or an award of damages in an amount to be proven at trial, but not less than $100 million;

Page 50 -   **FIRST AMENDED COMPLAINT**

2.    Prejudgment interest on all claims as provided by law;

3.    Post-judgment interest on all claims as provided by law;

4.    Attorneys' fees and litigation costs as provided by law; and

5.    For other such relief as this Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED April 18, 2018

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
**Henry Kantor,** OSB No. 792843
Special Counsel to the Attorney General
**Scott Kaplan,** OSB No. 913350
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Facsimile:  (971) 673-5000
Email:    henry.kantor@doj.state.or.us
              scott.kaplan@doj.state.or.us

-and-

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By:    s/Keith Ketterling
         **Keith Ketterling**, OSB No. 913368
         **Yoona Park**, OSB No. 077095
         **Nadia H. Dahab**, OSB No. 125630
         209 SW Oak Street, Suite 500
         Portland, OR 97204
         Telephone: (503) 227-1600
         Facsimile:  (503) 227-6840
         Email:    kketterling@stollberne.com
                      ypark@stollberne.com
                      ndahab@stollberne.com

Page 51 -   **FIRST AMENDED COMPLAINT**

**Amy Williams-Derry** (admitted *pro hac vice*)
**Derek Loeser** (admitted *pro hac vice*)
**Daniel Mensher** OSB No. 074636
**Matthew Preusch**, OSB No. 134610
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384
Email:        awilliams-derry@kellerrohrback.com
                  dloeser@kellerrohrback.com
                  dmensher@kellerrohrback.com
                  mpreusch@kellerrohrback.com

*Special Assistant Attorneys General for the State of Oregon*

Page 52 -   **FIRST AMENDED COMPLAINT**